# CHARLESTON.

OBERMAN, *Trustee*, v. RED ROCK FUEL COMPANY *et al.*

Submitted February 25, 1919.    Decided March 4, 1919.

1. CORPORATIONS—*Trust Deeds—Foreclosure—Waiver.*

A majority of the bondholders, constituting a majority also of the stockholders of a coal mining corporation, whose bonds are secured by a trust deed upon the company's property, providing for the payment of interest on such bonds semi-annually, and for the creation of a sinking fund to meet their payment when due, and further providing that the trustee shall sell the property upon written request of the holders of a majority of such bonds, if default is made in payments of interest and allowed to continue for a certain length of time, and also further providing that such company may lease its property, in case there is no default, with the consent of the trustee evidenced by his uniting in the lease or otherwise, by making a parol lease of such property at a time when a default existed, to which lease the trustee consented, and by putting the lessee in possession with the understanding had with him at the time that the lease would be formally executed by the corporation and delivered, as soon thereafter as a stockholders' and directors' meeting could be had, waive their right to demand a foreclosure of the trust deed as against such lessee. (p. 545).

2. BANKS AND BANKING—*Agency—Cashier.*

Where the trustee in such deed of trust, is at the same time one of the directors of such coal corporation and also cashier of the bank holding a majority of the bonds and acts in conjunction with the president of such bank, who is also president of such company, acting in good faith in doing what he believes to be for the best interest of the bank, acquiesces in such lease, he will be treated as the bank's agent, duly authorized to act on its behalf in the premises, and, by his acquiescence, estops himself and his principal from denying his agency.    (p. 545).

3. CORPORATIONS—*Principal and Agent—Agency—Presumption.*

A corporation, whose principal officers knowingly accept the benefit of services performed by one who assumes to act as its agent and whose officers hold meetings pursuant to previous arrangements made by such an one, for the purpose of effecting a lease of the company's property to another person, is presumed to have employed the person assuming to act for it, as its agent, and is bound by his acts, performed within the legitimate scope of his implied authority.    (p. 545).

83 W. Va.

4. SPECIFIC PERFORMANCE—*Lease of Coal Mine—Parol Agreement.*

The lessee of a coal mine under a parol agreement, the terms of which are clearly proven, entered into by the authorized agents and officers of a coal mining corporation, who has been put in possession of the property by them and has made valuable, permanent improvements thereon, under the assurance that a formal lease, in accordance with the parol agreement, would be shortly thereafter, formally executed by the company, is entitled to have the same specifically enforced by a court of equity, the legal remedy in such case being inadequate. (p. 550).

5. CORPORATIONS—*Rights of Lessee—Receivership—Accounting—Compensation.*

. Where, in a suit by the trustee in such case, to oust the lessee and foreclose the trust deed, on the written request of a majority of the bondholders, made after the lease was agreed upon, a receiver has been appointed, over the lessee's protest, and has operated the mine pending the litigation, and the lessee finally prevails, he is entitled to an accounting by such receiver, and is not chargeable with any part of the compensation properly allowable to such receiver for his personal services as such. (p. 550).

Appeal from Circuit Court, Marion County.

Suit by Howard A. Oberman, trustee, against the Red Rock Fuel Company and Thomas H. Boswell and others, with answer and cross-bill by defendant Boswell, in which a receiver of the company was appointed. Decree for plaintiff denying relief on the cross-bill, and defendant Boswell appeals.

*Reversed and remanded.*

*Martin & Seibert* and *Sperry & Sperry,* for appellant.
*Jno. J. Coniff* and *Neely & Lively,* for appellees.

WILLIAMS, JUDGE:

The Red Rock Fuel Company, a West Virginia corporation, owning 4403.74 acres of coal at Red Rock, Upshur County, on which it conducted a coal mining operation, and having its principal office in Fairmont, West Virginia, executed to Robert C. Dalzell, trustee, a deed of trust covering all of the aforesaid coal property, to secure a bond issue of $300,000 to obtain money for the purpose of developing said property. The deed of trust and bonds bear date November

1, 1910, and the bonds are payable in gold in thirty years and bear six per centum interest payable also in gold semi-annually, on the 1st of May and the 1st of November of each year. All of these bonds have been issued and are now held by the following persons and corporations and in the following amounts, viz.: George M. Alexander and Robert T. Cunningham, testamentary trustee of the estate of Lee L. Malone, deceased, $41,000; A. A. Fowler, executor of Anderson Fowler, deceased, $21,100; Adelaide H. Brown, $21,000; George DeBolt, $29,500; City Bank of Wheeling, $171,300; The Peoples Bank of West Virginia and the Dollars Savings & Trust Company, each hold $8,000 of the bonds as collateral to secure loans to said Red Rock Fuel Company. The deed of trust contains numerous covenants and provisions, among them is one by the grantor to pay the interest on the bonds, provide a sinking fund to pay off the bonds, and pay taxes on the property; and it is further stipulated that, in case of default in the payment of the interest on the bonds for sixty days, or of default in the performance of one or more of the other covenants, for a period of six months after notice thereof and demand by the trustee, said trustee may, and upon written request of the holders of a majority of said bonds outstanding and upon being indemnified to his satisfaction, *shall* proceed to sell the property.

There was also a provision that, "so long as there is no default as aforesaid," the company should have the right to lease the property for coal mining purposes, and that the trustee should confirm such leases "by uniting in the execution thereof or otherwise," but that, in case of such leases, the minimum royalty was to be not less than $6 per acre per annum, nor the royalty less than six cents per ton of coal actually mined, "run of mine;" and the interest of the company in such lease was to be subject to the lien of the deed of trust, but so long as said company was not in default it was permitted to collect the rentals.

On the 22nd of January, 1916, the trustee filed his bill, alleging that the Red Rock Fuel Company, the grantor, had defaulted in payment of interest on the bonds and in payment of any amount into a sinking fund, and that he had

been requested in writing, by the holders of a majority of the bonds, to take possession of the property and proceed to sell the same for the benefit of the bondholders, there being a provision that, in case of such default, the trustee might declare all the outstanding bonds due and payable. Plaintiff further alleges that, several months prior to the filing of his bill, the Red Rock Fuel Company had permitted one Thomas T. Boswell to take possession of its property, and that he is now, and for several months past has been mining and disposing of the coal therefrom, without proper authority and, therefore, that plaintiff is unable to take possession of the property and dispose of the same in the manner provided in the aforesaid trust deed. He alleges that he does not know by what arrangement or agreement between the aforesaid company and said Boswell the latter claims the right to operate the property, and, "on information and belief;" avers that said Boswell is not operating the same under any valid agreement with said company. The Red Rock Fuel Company, all the bondholders and said T. T. Boswell are made defendants to the bill. Plaintiff further alleges that the Red Rock Fuel Company has been conducting its business for many years at a loss; that it is insolvent, and the security of the bondholders is becoming less valuable as the coal is being removed, without a proportionate amount of the proceeds realized therefrom being deposited in a sinking fund; that said Boswell's possession casts a cloud upon the title to the property, and will prevent plaintiff from obtaining a reasonable price therefor. He prays for the appointment of a receiver to take charge of the property, for an injunction order restraining said Boswell, his agents and attorneys from interfering with such receiver in any manner, for a judicial ascertainment of the liens and their priorities upon said property, for a decree authorizing a sale thereof, and for general relief.

Pursuant to notice, served upon the defendants George M. Alexander, Robert T. Cunningham, George DeBolt and the Red Rock Fuel Company on the 22nd of January, 1916, and service thereof acknowledged on the previous day by the City Bank of Wheeling, and, apparently, without notice to

any of the other defendants, the court, on motion of plaintiff, appointed the defendant George DeBolt receiver, with authority to take charge of the property and carry on the operation of mining coal, directed said T. T. Boswell, his agents and servants to turn the property over to said receiver, and enjoined said Boswell, his agents and servants from interfering with the possession and control of the receiver.

At March Rules, 1916, defendant T. T. Boswell filed his answer and cross-bill, to which he made plaintiff and the defendants named in the trustee's bill, except himself, parties, alleging that he was rightfully in possession of the property under a lease from the Red Rock Fuel Company, the terms of which had been previously agreed to between himself of the one part, and Robert C. Dalzell, trustee, George M. Alexander, Robert T. Cunningham and George DeBolt, representing the Red Rock Fuel Company and its bondholders of the other part, but which had not been formally executed, and prays that he may have a decree compelling specific execution thereof. Defendants answered both the bill and the cross-bill, but none of them, except said Boswell, denied any of the allegations of the bill. But the answers of Alexander and Cunningham, the Red Rock Fuel Company, Dalzell, trustee, A. A. Fowler, executor of Anderson Fowler, deceased, Peoples Bank of West Virginia, The City Bank of Wheeling, and Adelaide H. Brown, deny the averments of the cross-bill respecting the lease agreement alleged to have been made with the defendant Boswell, and deny that the trustee had any authority to consent to a binding lease, in view of the default then existing in the payment of interest on the bonds, and they deny his authority to represent the bondholders. Replications were made to the several answers, and depositions of numerous witnesses were taken, pro and con, on the issues thus made. The court, on full hearing, entered a decree on the 1st of February, 1918, denying said Boswell the relief prayed for in his cross-bill and held the plaintiff, Howard A. Oberman, substituted trustee in the room and stead of Robert C. Dalzell, whose previous decease had been brought to the court's attention, was entitled to

the relief asked in the bill, found the several amounts due the various bondholders, and decreed that, if said sums were not paid within thirty days, then George De Bolt, who was appointed a special commissioner · for the purpose, should advertise and sell the property.

T. T. Boswell has appealed from the foregoing decree, and complains also of certain other interlocutory orders and decrees, one made on the 22nd of January, 1916, appointing the receiver and enjoining said Boswell from interfering with his possession or management of the property, another entered on the 16th of February, 1916, overruling appellant's motion to dissolve the injunction and discharge the receiver, and another made on January 26, 1917, again refusing to dismiss the receiver on appellant's motion after plaintiff's depositions had been taken and filed.

The vital question in the case and the one decisive of all others is, has appellant proven a lease agreement between himself and the Red Rock Fuel Company and the trustee for the bondholders, entitling him to a specific performance thereof. The testimony of witnesses respecting this fact is irreconcilably conflicting, and, if the case depended alone upon such evidence, we do not hesitate to say that, in view of our previous holdings in such cases, we would not disturb the finding of the lower court. But there is much written evidence in the record, which we think is of much greater weight than the conflicting oral testimony, corroborating the testimony of appellant's witnesses.

The Red Rock Fuel Company, for a long time prior to the making of the alleged agreement with appellant in the City of Baltimore, on the 24th and 25th of September, 1915, had been trying to lease or sell its property. It had been operating at a loss, and the trustee alleges in his bill that said company was insolvent. As early as January 12, 1915, its secretary wrote appellant, suggesting the leasing of this property to him and gave him a general description of its location and the thickness of the vein of coal. In this letter the writer says:

"The proposition of leasing on a royalty basis has not been discussed by the owners, but I think this could be worked

out. If you are sufficiently interested and desire to send someone to see the mine kindly advise the time, and will try to meet him either at Grafton or Red Rock.''

Two days later appellant replied, asking for the terms on which the company was willing to make a lease, the lowest royalty per ton and the minimum royalty per year. On January 22, appellant received another letter, this time from Mr. H. H. Lanham, in which the writer says he had arranged with Mr. DeBolt and the stockholders for a meeting to be held in Philadelphia on February 1st, informing him that, after the meeting was held, he and Mr. DeBolt would come to Baltimore, ''with the authority to lease or sell this property, and if possible to take this matter up with you in detail.'' Mr. DeBolt was secretary of the company, and Mr. Lanham says he was acting as its agent under a written contract signed by Robert T. Cunningham, vice-president. But Lanham's agency is controverted. Mr. Cunningham denies that he authorized Lanham to try to sell or lease to appellant, or that he had the authority to do so, but admits that, early in the spring of 1915, he wrote Mr. Lanham, stating in general terms the basis on which he would consider leasing the property to certain persons in Fairmont, who, Mr. Lanham stated, desired to lease it. Two checks for $100 each are in evidence, one dated October 27th and the other November 9th, 1915, drawn upon the City Bank of Wheeling, one payable to the order of the National Bank of Fairmont and the other to the order of H. H. Lanham, on both of which, it is admitted, said Lanham drew the money. These checks were signed by George DeBolt, Secretary of the Red Rock Fuel Company, and by Robert T. Cunningham, vice-president. Mr. Lanham swears that, for bringing about the lease agreement between appellant and the Red Rock Fuel Company, he was to be paid a commission and the checks were payments thereon, and that he applied them on the expenses of his trip to Baltimore to see appellant. He further says he had talked several times about the matter with Mr. Alexander and Mr. Cunningham, and on one occasion in a conversation with Mr. Alexander about his commission, he replied: ''You lay low and saw

wood until this matter is settled, and then come in and see about the matter and we will settle with you then.'' He also swears Mr. Cunningham told him practically the same thing. Whether Mr. Lanham was actually employed as agent, under a written contract with the Red Rock Fuel Company or any of its officers or directors, is not material, for it is proven beyond question that he was very active in bringing about a meeting between the Red Rock Fuel people and appellant which was held in Baltimore on September 24th and 25th, and attended the meeting himself. It also appears that he kept the officers of the company fully advised as to what he was doing in the premises. In a letter of January 26, 1915, signed Red Rock Fuel Company by George DeBolt, Secretary, the writer acknowledges receipt of appellant's letter of the 14th January, and says:

''We are now counting on having a meeting about the 1st of February when we can go into this matter, and if the others interested are favorable to a proposition of this kind, we will take it up further with you. * * * * Mr. H. H. Lanham has shown me your letter to him on the 23rd inst.''

In the letter referred to, appellant had written Lanham, suggesting that 10% of the price, for which the coal should be sold, would be a proper royalty basis, if a lease should be consummated, and that he would like to see Mr. Lanham in Baltimore, at any time suitable to him. Correspondence continued between appellant on the one part and George DeBolt and Mr. Lanham on the other, at short intervals, from that time on, until after the alleged agreement was made on the 24th and 25th of September of that year. Under date of August 5th, appellant wrote Mr. DeBolt saying:

''I have been going over the matters pretty thoroughly in regard to the Red Rock Fuel Company's property with Mr. Lanham, and I have come to the conclusion that after examination, and finding the property alright, that I am prepared to take the property over on a royalty basis of ten cents (10c) per gross ton, guaranteeing to pay royalty the first year on 150,000 tons, the second year 200,000 tons and the third year and thereafter 300,000 tons. I am also to take over the stock in store and whatever mules and horses

you may have on hand. If I enter into a lease, it is understood that the royalty is to be paid quarterly on the 20th of the month following the quarter. Of course all necessary improvements, machinery, etc., needed for increasing the output after I take the lease is to be supplied by me. I would like for a decision in this matter as soon as possible and if favorable, then kindly give me written option on the property on *these* basis for fifteen days. If I am to take this property over, I would like the date of the lease to commence September 1st.''

On the previous day Mr. DeBolt had written Mr. Lanham in Baltimore, enclosing an analysis of the company's coal, apparently on the latter's request and for the purpose of appellant's information, for, in another letter, addressed to Mr. DeBolt, appellant acknowledges receipt of the analysis from Lanham and expresses surprise on learning that the per centum of sulphur runs so high, the analysis showing 2.20%. On August 9th, Lanham wrote appellant that he had taken up his proposition of leasing the coal with DeBolt and Cunningham and they had called a meeting of the company at Fairmont on the 12th, and would go over his proposition thoroughly and then give him an answer. And on August 13th Lanham sent him the following telegram:

''Fuel Company considered your proposition at meeting yesterday feel sure the matter can be speedily concluded after you have examined property and find same satisfactory advise when you will come.'' Mr. DeBolt, secretary of the company, wrote appellant on September 3rd, after appellant's son had made an examination of the property, saying: ''I am glad to know that your Mr. E. T. Boswell was fairly well impressed with our property as I felt that he went into the matter very carefully and thoroughly.'' In the closing paragraph he says: ''The writer, as well as Mr. Cunningham both enjoyed very much the visit to the property with your son.'' On the 1st September, after E. T. Boswell, appellant's son and agent, had examined the property and made a report thereof to appellant, he wrote De-Bolt, stating what his son had reported to him as to the thickness of the vein, the number of mine cars and the mine's

capacity, in its then condition; and again expresses surprise at the result of an analysis which, he says, the Baltimore City chemist had made of some samples of the coal his son had taken from the mine, and further says he can go no further, until he can have a test made of a couple of cars of the coal by the Baltimore & Ohio Railroad Company, which he thinks will be done shortly. At appellant's request, Mr. DeBolt on September 8th, mailed to him a form of lease, in order to give him a general idea as to the form of lease, and said, "Whatever changes necessary to be made both parties to the lease would have to get together and agree." He further says, referring to the form of lease enclosed: "This copy belongs to Mr. Lanham and if you desire to make a copy before returning it you may do so." Appellant returned the copy on the 9th of September and, among other things, says: .

"As we have got to add considerable to the equipment to be able to increase the output, we will not give any bond as we consider that equipment that we are to add to the property is sufficient guarantee for your royalty and the fulfillment of the lease. We must also ask that the lease contain a clause protecting us in case of car shortage and strikes. If you will draw a lease along these lines, have it dated the first of October, I am prepared to accept same, but must know in a reasonable time whether your people are willing to enter into this lease or not I do not wish to spend money and my efforts in looking up business for this coal, if I am not to work the property. You must also enter into an agreement, by which I will be allowed to transfer this lease to a Company in case I may later decide to incorporate a Company for working this property. The first thing needed, and that at once, will be a car of rails and to be able to get railroad cars enough to mine the required quantity, it will be necessary for us to install another generator, engine and boiler. I have been already notified to that effect by the rating clerk of the B. & O. Railroad. Your rating being extremely low on account of this shortage. Kindly let me hear from you as soon as you can, and oblige."

This letter, although addressed to Mr. DeBolt, appears to

have been answered by both him and Mr. Lanham on the following day. In his reply DeBolt says:

* * * "We are taking immediate steps to get a meeting of our people to consider your proposition. We must advise you however, that we have never considered anything less than 12 cents per ton of 2240 pounds when discussing the advisability of leasing the property, and we have likewise never considered in our discussions leasing all of the acreage with the present mining plant. Just as soon as we can get the views of our associates we will arrange for a meeting, with the view of working out an agreement. We assure that this matter will be hurried all possible."

And Mr. Lanham writes: "We had another meeting of the Red Rock Fuel Company's committee this afternoon after receiving your letter this morning;" and suggested any time after the first of the week, convenient to appellant, they would go down to Baltimore and go over the matter with him in detail, saying further:

"We feel sure that this matter can be worked out satisfactorily to all and with much less trouble by all being present at the time. Corresponding is a very poor way to negotiate a deal of this magnitude and for that reason I had them get together this afternoon and we have arranged as above stated."

But before receiving either of these replies, appellant wrote Mr. DeBolt on September 10th, the following letter:

"Regarding bond, I forgot to state in my letter of yesterday, that if your Company will agree to furnish the necessary additional equipment required to make it possible for me to get out the minimum quantity required, I would not mind giving $25,000 bond. But, I cannot see why I should have to do both, give bond and equip the mine, when it is going to require about three times the equipment that is there now to work the property as it should be worked."

On September 14th appellant received the following telegram from Lanham:

"We have been delayed by waiting on some information from some parties in Wheeling as soon as information is re-

ceived here Mr. DeBolt and myself will come to Baltimore and finish this matter with you while there."

And on the 17th, received the following letter from him:

"I have taken the matter up with Mr. Alexander and Mr. Cunningham, and I am of the opinion that we will leave here Sunday afternoon and be in Baltimore Monday morning. If this arrangement is changed I will wire you. Mr. De-Bolt and I have acted in very good faith in this matter and the delays are due to Mr. Alexander, Mr. Cunningham and Mr. Dalzelle of Wheeling, but I think everything is coming around all right at the present time and we will be able to finish this deal within a few days."

Mr. DeBolt also wrote him on the same date as follows:

"Was in hopes that we could take up our Red Rock proposition this week, but have been waiting for an expression from the others associated with us. Will try and arrange to have a conference with you in Baltimore early next week, and will advise you definitely not later than the coming Monday; or tomorrow if possible."

Pursuant to previous arrangement, a meeting in Baltimore was had with appellant on 24th and 25th of September, at which his son E. T. Boswell, Lanham, DeBolt, Cunningham, Alexander and Dalzell, the trustee, were present.

We have taken pains to quote much of the correspondence, because we think it furnishes evidence of a conclusive character establishing the following facts: First, that Lanham was acting on behalf of the Red Rock Fuel Company and that its officers had knowledge thereof; second, that Mr. Dalzell, the trustee, was informed of the efforts then being made by Lanham and DeBolt to effect a lease of the Red Rock Fuel Company's property to appellant, and acquiesced therein, in the manner hereinafter pointed out.

At that meeting, according to the testimony of appellant, his son and Lanham, all the material provisions of the lease were discussed among the parties, understood and agreed to, and were reduced to writing, except the description of the property to be covered by the lease, and the wording of a car shortage clause, but was not then actually signed by the parties; and that it was also thoroughly understood among

all the parties that the lease was to take effect and possession delivered to appellant on October 1st, 1915; that the line or lines, dividing the property leased from the remainder of the company's coal, should be thereafter determined by it and inserted; and that a car shortage clause should likewise be inserted, and the paper then executed by the company by its proper officers and by Robert C. Dalzell, trustee, and appellant.

On returning to Fairmont the officers of the company immediately sent written notices to all the stockholders calling a meeting to be held on October 1, 1915, at the City Bank of Wheeling, in the City of Wheeling. That meeting was held and the following stockholders were present: R. T. Cunningham, A. A. Fowler, A. S. List, R. C. Dalzell and George DeBolt, Cunningham and Fowler appearing both in their representative and personal capacities, each being noted, as a holder in his own right, of one share of stock. The stock there represented was 8929 shares, out of a total of 10,000 shares. Mr. A. S. List presided, and George De-Bolt was made secretary. A resolution was passed, reciting that certain officers and stockholders of the company had had a conference with T. T. Boswell "with the view of ascertaining whether or not it would be possible to reach an agreement with said Boswell whereby a lease could be made to said Boswell of this company's Red Rock property," and further, that in the judgment of the stockholders a lease of the property to said Boswell upon the following terms would be advantageous, "provided such form of lease be acceptable to said Boswell." The resolution then proceeds to set forth the terms and conditions of a lease covering practically one-half of the company's coal acreage, and giving appellant an option to lease the other half, which does not differ materially from the terms and conditions set forth in the form of lease reduced to writing at the meeting in Baltimore, except that it was left to the discretion of the board of directors whether or not Mr. Boswell should be required to give a bond for the faithful performance of his covenants. Mr. Dalzell says the stockholders of the Red Rock Fuel Company and the bondholders are one and the same persons,

except two or three persons who are mere nominal stock-holders. The money to finance the corporation, apparently, was not raised by the sale of stock, but altogether on the issue and sale of bonds, and the stock was issued to the bond-holders in proportion to the amount of bonds they held. Only a few men composed the company and nearly all of the stockholders were also directors. At a directors' meeting held also at the City Bank of Wheeling, immediately after adjournment of the stockholders' meeting, the following five of the seven directors were present: List, Dalzell, Cunningham, Fowler and DeBolt. Lowell Brown and G. M. Alexander the only other directors were absent. Mr. List and Mr. Dalzell were also stockholders and directors of the City Bank of Wheeling, the former being also its president and the latter its cashier, and said bank holds $171,300 of the Red Rock Fuel Company's bonds, which is more than a majority of them.

On October 4th appellant wired DeBolt to know what was done about the lease, saying: "Have appointment in Philadelphia tomorrow but will do nothing until hear from you or have lease in hand. Please wire." DeBolt answered immediately both by wire and confirmatory letter, saying:

"Lease for Red Rock property approved at stockholders' meeting held October 1st without material change from paper you hold and ordered executed, providing for insertion of car shortage feature. Paper cannot be executed until boundaries are established. You are safe in going ahead with your arrangements."

An inventory of the live stock, wagons, mine supplies and other materials was taken and turned over to appellant "as lessee October 1st, 1915." In his letter enclosing the same, DeBolt writes, under date of October 29th, "We are having the acreage divided and think this will be ready by the first of next week so that a lease can then be duly executed." Appellant was placed in actual possession on the 10th, but to take effect as of the 1st of October, 1915. Thereafter, according to his evidence, he made valuable, permanent improvements on the property amounting to over $4,500. This, however, is contested. Part of this expense was for labor

in hanging wire, repairs to mine cars, digging a well and laying tracks in the mine headings, removing rock from the mine floor in order to get proper height in the headings, and $413.86 of it, he says, was the difference in cost in removing coal from the headings and removing it from the rooms. Although appellant admits that these items are chargeable to general operating expenses, nevertheless he insists they are permanent improvements. In our view of the case, we need not decide how many or what particular items can properly be regarded as permanent improvements. But it seems that the digging of the well, the removal of rock from the floor and the laying of track in the headings, as well as necessary repairs on mine cars, could properly be so regarded.

Appellees insist on the following propositions as constituting a bar to appellant's claim to affirmative relief: (1) That Robert C. Dalzell, trustee, could not, and did not, join in the execution of the alleged Baltimore lease; and (2) That the Red Rock Fuel Company did not agree to said lease. The first proposition is based on the assumption that, because of default in the payment of interest on the bonds and failure to provide a sinking fund, the trustee was forbidden, by the terms of the trust, to consent to the execution of a lease. This provision, however, we think was waived. In its answer, the Red Rock Fuel Company admits that default had existed for years, in fact, that it had paid interest on the bonds only for the first six months after the trust deed was executed, and all parties admit that, up to the time of making the alleged lease to appellant, the company's business had been unsuccessful, and that it was then insolvent. The record discloses much anxiety on the part of the bondholders to lease the property to someone who could and would make its operation a success. The trustee was the cashier, the active agent of the City Bank of Wheeling which held a majority of the bonds. He and all the bondholders knew that default had existed for years, yet no steps were taken by any of them to enforce the trust. By their silence and participation in the negotiations for a lease to appellant, the City Bank of Wheeling, A. S. List,

R. T. Cunningham, G. M. Alexander, A. A. Fowler and George DeBolt waived their right to demand an enforcement of the trust in derogation of appellant's right, and are now estopped to insist on a sale. The parties above-named are the holders of more than $260,000 of the $300,-000 bond issue. The default provision was for the protection of the bondholders, and they had the power to waive it. It required the holders of a majority of bonds to insist on its enforcement. Yet the trustee was not requested to foreclose the trust deed until more than three months had passed, after the alleged lease to appellant. Why was he not requested to sell the property sooner? A fair inference to be drawn from the facts and circumstances clearly established is, we think, that the bondholders knew a sale of the property would be disastrous to them, and they considered that a better plan would be to try to lease it to someone who could successfully operate it, and make it yield something with which to pay interest. Being both a director of the Red Rock Fuel Company and cashier of the bank holding a majority of the bonds, it is hardly conceivable that the trustee did not discuss the matter with the directors of his bank, among whom was Mr. List, the president, who was also a director and president of the Red Rock Fuel Company. The circumstances appearing in the case are sufficient to establish an implied waiver of the right to insist on a foreclosure, not only on the part of the City Bank of Wheeling, but also on the part of all other bondholders who, in anyway, participated in the meeting, held with appellant in Baltimore, or in the stockholders' meeting, held in Wheeling the 1st of October.

The material provisions of the lease agreement, we think, are clearly and fairly proven. According to the contention of the appellees, the only features of the lease upon which a full understanding and agreement were not had at the Baltimore meeting are, (1) the lines dividing the property into halves, separating that part covered by the lease from the remainder upon which appellant was given only an option to lease; (2) the wording of a car shortage clause; and (3) whether or not appellant should be required to give a bond

for the faithful performance of his covenants. Appellant was not particular as to how the division of the property was to be made, whether by an imaginary line, or by the lines dividing the lands of the owners of the surface, the coal property consisting of a consolidated boundary, made up of numerous small tracts purchased from the individual owners thereof, and, therefore, he says, he left that matter to the agents of the coal company. That such was the understanding is fully shown, we think, by a letter from appellant to R. T. Cunningham dated October 20th, in reply to one received from him dated October 18th, in which Mr. Cunningham said:

"As you have heretofore been advised the stockholders and directors of the Red Rock Fuel Company held a meeting on October 1st and authorized the leasing of Red Rock Fuel Company property to you upon terms and conditions heretofore substantially agreed upon, and approved the form of a lease to be executed by the Fuel Company to you. This lease was to take effect on that day, October 1st, provided it met with your approval. In order to complete this agreement and lease ready for execution it is necessary, as you know, to locate the line dividing the property which you take under the lease and the property which you take under the optional provision contained in the lease; it is also necessary to survey our that part of the property which is supposed to be faulty. This is the 18th day of October and nothing has been done as yet to make these surveys preparatory to the completion of the lease and its execution by yourself and Red Rock Fuel Company." Appellant replied, expressing surprise that any blame should be attached to him because the lines were not established, and said, "my son was at Red Rock most of last week, partially for that purpose," and that, as he understood it, the failure was because of the company's not coming to a decision as to whether it would take the crop lines or the surface lines, and whether it would draw an imaginary line across the property, or take the lines of the different farms. "Either will be satisfactory to me," he says, "(although I imagine an imaginary line would be best) just so you divide the

property in half after deducting .the faulty portion.'' Appellant's contention is further substantiated by the form of lease drawn sometime after the Wheeling meeting, and presented to him for his acceptance. This draft contains a description of the land included in the lease, by reference to various deeds to the company for the coal from the landowners.

That the lease was to contain a car shortage clause, intended to relieve the lessee from the payment of the full minimum royalty in case the railroad company should fail to furnish the mine with enough cars to take care of the tonnage of coal applicant was under obligation to mine, is shown by two letters from him to DeBolt, one on September 9th notifying DeBolt that he would require such a clause in the lease, and the other on September 25th, the last day of the Baltimore meeting, in which he gave his version of the proper wording of such a clause, and in a postscript to his letter says: ''You will remember Mr. Cunningham asked for a letter bearing on this.'' Answering this letter on September 27th, Mr. DeBolt says: ''Have furnished the others interested with a copy of this letter so that it can be taken up definitely at our Stockholders and Directors meeting on Friday of this week,'' which day, as shown by the calendar for the year 1915, was the 1st day of October, the day on which the meetings were held at Wheeling; and is further conclusively shown by the additional fact that the lease, thereafter prepared and tendered to the appellant, contains a car shortage clause which is substantially in accord with the form contained in appellant's letter. Mr. Alexander also says it was agreed that Mr. Boswell was to ''send us his suggestion as to the form of the car shortage clause.'' The purpose of such a provision appears to have been thoroughly understood and agreed to, and, seemingly, the only reason it was not inserted in the lease drawn up at the Baltimore meeting, was the difficulty in properly expressing it in words.

That it was then also agreed that appellant was not to give. a bond, is also established, not only by the direct and positive testimony of Mr. Boswell, his son and Mr. Lanham,

but also by the correspondence between the parties, and the proper inferences to be drawn therefrom. In the first place, on September 9th, long before the Baltimore meeting, appellant wrote DeBolt, stating positively that he would not give a bond, and gave as his reason therefor, that the additional equipment he would be required to put in the mine, in order to increase its capacity so as to enable him to produce the minimum quantity agreed upon, was a sufficient guaranty that he would comply with his covenants. Moreover, the draft of lease containing the provisions agreed upon at Baltimore contains no provision for a bond. Furthermore, Mr. Alexander who dictated the lease and who took with him to Baltimore his stenographer for the purpose of transcribing his dictation, in his testimony concerning a bond, says: ''Some of our people insisted on having a bond provision in the lease. Mr. Boswell insisted strenuously on not having any bond provision in the lease and we quit our discussion without having reached any decision at all, or without attempting to reach any decision, because we went there for the purpose of preparing a suggested form of lease from which we should work and see how near we could get together.'' Yet this witness admits the lease was to be prepared before a meeting of the stockholders and directors of the Red Rock Fuel Company, and those meetings were to be held as soon as possible after their conference in Baltimore. Is it not a little unreasonable that the representatives of a majority of the bondholders and stockholders of the Red Rock Fuel Company should make a trip to Baltimore and spend two days, simply for the purpose of ascertaining how near they could come to an agreement as to the terms of a lease, concerning which so voluminous a correspondence had been carried on between the parties, extending over a period of eight or nine months? Again, how was it possible for the lease to be prepared in advance of the stockholders meeting, as Mr. Alexander says, if so important a provision as the giving of a bond had not been agreed on? This witness says Mr. Boswell positively refused to execute a bond, thereby indicating not only that the matter had not been agreed upon, but also, according to his version, because

of Boswell's positive refusal, could not and would not be agreed upon. Why, then, the necessity of calling a meeting in order to get the stockholders' consent to execute a lease which, according to the view of this witness, the lessee had positively refused to agree to? The question suggests the answer, i.e., it was a vain and idle proceeding. Delivery of possession to appellant is wholly inconsistent with appellees' contention that all the material provisions of a lease had not been previously agreed to. Mr. DeBolt wired and wrote him on October 4th, that the lease had been approved "without material change from the paper you hold and ordered executed, providing for insertion of car shortage feature." If appellees had then decided to require bond, it is hardly consistent with good business principles, nor with sound reason that possession should have been turned over to Boswell, knowing at the time that he had positively refused to give such bond. A consideration of all these matters and circumstances forces upon us the conviction, that appellees really desired that Boswell should execute a bond but on being convinced of his unwillingness to do so, rather than lose the opportunity to lease the property to him they were willing to forego and did forego their demand for a bond. Mr. Dalzell's knowledge and acquiescence is shown by his letter to appellant on November 3rd, 1915, in answer to one received from appellant on the previous day giving Dalzell an account of what appellant was doing, and had planned to do in the future to increase the output of the mine. Mr. Dalzell, after expressing his pleasure that the prospects were so bright, "for our sake and for your sake," says further, "we see no reason why you should fail of a profitable undertaking;" and also expressed the hope that appellant was "putting on the armor for a good fight for the Peerless Coal Mining Company," that being the name chosen by appellant for the business instead of the Red Rock Fuel Company. This was written nearly a month after possession had been actually turned over to appellant.

We are of the opinion that appellant has clearly proven a lease agreement, all the provisions of which are sufficiently definite to entitle him to the specific relief for which he

prays, and that to deny him such relief would be inequitable. His legal remedy is wholly inadequate, there being no way of ascertaining the amount of damages he would sustain, if he should be denied the right to mine the coal under the terms and provisions of the lease contract. It was to extend for an indefinite term to enable the lessee to mine all the merchantable coal in the Red Rock vein under the property.

By reason of the conduct of appellees appellant was led to alter materially his situation; he was put in the possession of the property and allowed to make some valuable, permanent improvements thereon; and he had arranged to increase largely the output of the mine, and had made profitable contracts covering much of the future output of the mine. By their conduct appellees are estopped now to deny his equities. The conduct whereby a party may estop himself to assert rights adverse to another, need not exist for any particular length of time; to work an estoppel, it is only necessary that his conduct should mislead another to his detriment. The principles applicable to a parol contract for the sale of land are applicable here, and it has often been held, that where a vendor sells lands to a vendee by parol contract and puts him in possession, and the vendee puts valuable, permanent improvements thereon, he is entitled to specific performance, even though he has not paid the full consideration. It is true the complainant in such case must prove clearly the terms of his contract, and we think appellant has done so in this case. The consideration for the lease was the royalty which was to be paid from month to month, as the coal was mined; it was a running contract which could not be fully performed at the date of its execution, as in the case of a sale of land; and, hence, the greater reason for granting specific relief in the case of a lease, if any difference, than in the case of a sale of land, because of the greater inadequacy of the legal remedy in determining the amount of damages for a breach in the former case.

Appellant tendered checks covering the royalties on coal produced during the months of October, November and December, but they were promptly returned for the reason, as stated by Mr. DeBolt, that the lease had not been signed and

executed by both parties, and, therefore, he could not accept them.

Appellant admits he agreed to take over the live stock and store goods and pay for them in cash, but declined to pay for them when demand was made, for the reason, given by him, that he had understood the company, because of the advance in the price of coal, was planning to get the property back from him. He appears to have been so advised by Mr. Lanham by letter of December 3rd.

Appellant is entitled to have a lease executed according to the terms and provisions of the writing, a copy of which was furnished him in Baltimore, to be effective as of October 1, 1915, except that a car shortage clause, similar to and having the same effect as the clause contained in his letter to Mr. DeBolt of September 25th, 1915, and a description of the property leased, according to the description in the lease tendered to, and rejected by appellant, shall be inserted therein. He is also entitled to an accounting by the receiver for the personal property taken over and for the coal mined by him during the time he has been in possession, less the royalty at the rate agreed on, to-wit, 11.2% per ton, but is not to be charged with any portion of the compensation properly allowable to such receiver for his services.

The decrees complained of by appellant are reversed, and the cause will be remanded for further proceedings in accordance with the principles herein announced, and further according to the rules and principles governing courts of equity.

*Reversed and remanded.*