T. J. BLAIR, JR., *et al.*

*v.*

JOHN L. DICKINSON, *et al.*

(No. 10085)

Submitted April 19, 1949. Decided June 21, 1949.

LOVINS, JUDGE, not participating.

KENNA, JUDGE, dissenting.

FOX, JUDGE, replying for majority.

*Jackson, Kelly, Morrison & Moxley, Thomas B. Jackson, W. L. Lee,* for appellants.

*Wolverton & Callaghan, Campbell, McClintic & James, Mahan, White & Higgins, Chas. E. Mahan,* for appellees.

FOX, JUDGE:

John L. Dickinson prosecutes this appeal from a decree of the Circuit Court of Nicholas County, entered on February 18, 1948, in a chancery cause then pending in said court, in which T. J. Blair, Jr. and J. N. Berthy, Jr. were plaintiffs, and John L. Dickinson and Gauley-Eagle Coal and Coke Company, a corporation, were defendants. Said appeal was granted by this Court on July 30, 1948. The parties to the suit will be hereafter referred to as "Dickinson", "Blair", "Berthy" and "Gauley-Eagle". J. R. Maust, the president of Gauley-Eagle, and who represented it in the negotiations here involved, will be referred to as "Maust".

On December 26, 1944, the Muddlety Coal and Land Company, a corporation, conveyed to Dickinson, Blair and Berthy, in equal interests, tracts of 9842.61 acres, 1260 acres, and 50 acres, all more or less, situated in Hamilton District of Nicholas County. On October 17, 1945 Joseph H. Baker, Jr. and wife, conveyed to the same parties, and in the same interests, a lot of .31 acre, adjoining one of the larger tracts; and on November 1, 1945 John Hicks conveyed to the same parties, and in like interest, an ad-

joining tract of 25 acres. In the conveyance made by the Muddlety Coal and Land Company aforesaid, there was reserved tracts of 92 acres and 30 acres. In plaintiffs' bill it is alleged that the plaintiffs and Dickinson conveyed to Strouds Creek & Muddlety Railroad Company, 2 tracts of 16.70 acres and .06 acres, and conveyed to the Baltimore & Ohio Railroad Company, with reversion provisions, a tract of 4.77 acres. It is also alleged that the tracts of land owned by plaintiffs and Dickinson aggregated 11,000 acres, more or less, which was subject to an oil and gas lease covering 1484 acres thereof, and certain rights of way and easements, none of which are relevant to this controversy. It is admitted by all parties to this litigation that said lands are chiefly valuable for the minerals which may lie thereunder, the surface being wild and mountainous.

Soon after acquiring title to said lands, the owners sought to bring about the development of the minerals aforesaid, particularly the coal thereunder, and did so by endeavoring to lease portions thereof for coal mining purposes. In the summer and fall of 1945, Berthy began negotiations with his co-owners for the lease of 404 acres thereof for coal mining purposes, and on October 24, 1945, a written lease of that character, and for that acreage, was prepared and signed by Blair and Berthy, but was not signed by Dickinson. Dickinson became ill in August, 1945, went to Florida in December of that year, where he remained until April, 1946. In the meantime, Berthy had assigned his lease on the 404 acres to the defendant, Gauley-Eagle, and that company had begun stripping operations under said lease in November or December, 1945, and paid its first royalty to the lessor owners in January, 1946.

It appears that Dickinson was not satisfied with the lease of the 404 acres which Blair and Berthy had signed, but the record is not clear as to the nature of his objection thereto. However, he accepted, with reservations

bearing on the form of the lease, payment of his share of the royalties accruing thereunder, until sometime in 1947, when he refused to accept such payments until he could be assured that the coal for which royalty payments were offered had not been mined from land outside the 404 acres covered by the lease aforesaid, evidently fearing that his acceptance of such payments might prejudice his position in respect to the dispute which had by that time arisen over a lease on 4700 acres hereinafter to be dealt with. On his return from Florida to his home in Charleston, West Virginia, Dickinson visited the property in April, 1946. In the spring and summer of 1946, Gauley-Eagle was induced by Berthy to increase its investments and make plans for a tipple and the necessary roads thereto on a stream called Laurel Fork, and at a point outside the 404 acre lease; and Gauley-Eagle interested the Baltimore & Ohio Railroad Company in building a spur or siding up Laurel Fork, the right of way therefor to be furthered by Dickinson, Blair and Berthy. This work stopped because one John G. Hoffstot claimed the right to interfere because of an asserted contract for the purchase of the surface of 398 acres, and certain coal therein, within the 11,000 acre tract.

At this point another complication comes into the case. Prior to July, 1946, Dickinson, Blair and Berthy had been negotiating with John G. Hoffstot, aforesaid, for the sale of 398 acres of surface and the coal above an elevation of 2,005 feet above sea level, supposed to be 197 acres of coal, situate within the boundaries of the 11,000 acres; and Hoffstot claimed to have a binding and enforceable contract for its purchase. The matter went so far that a deed was prepared conveying said property to Hoffstot, which, if executed, would have conveyed said surface and coal to the said Hoffstot. Dickinson and Blair were willing to execute this writing, but Berthy refused to do so, allegedly because a right of way, necessary to other portions of the 11,000 acres, had not been reserved in the proposed deed. Then, according to Berthy, he was asked

by Dickinson and Blair to purchase the said 398 acres of surface, and the 197 acres of coal, at the same price as that which Hoffstot had been willing to pay therefor. Berthy was willing to make the said purchase on the terms proposed, and a deed was prepared which, if executed, would have conveyed the same to Berthy's assignee or nominee. This paper was executed by Blair and Berthy, but Dickinson refused to sign the same, and has always insisted, as he now insists, that he has never at any time agreed to sell said property to Berthy. In July, 1946, Hoffstot instituted his suit in equity in the District Court of the United States, for the Southern District of West Virginia, for the specific performance of his alleged agreement for the purchase of the 398 acres. Later, on July 29, 1946, it is claimed that an agreement was reached between Dickinson, Blair and Berthy concerning the sale to Berthy of the 398 acres, subject to the outcome of the Hoffstot suit, then pending, and a written collateral agreement was prepared evidencing that agreement; but which was never signed. According to Blair and Berthy, there was an oral agreement some forty days thereafter to convey the 398 acres to Berthy without any collateral agreement. Berthy, at different times, July 9, 1946, July 25, 1947, and August 11, 1947, tendered certified checks for what he says was the agreed price for the 398 acres, and his tender was in each instance refused. Hoffstot finally lost his suit, but the same was pending at the date of the alleged lease on the 4700 acres hereafter to be dealt with, and which covered both the 404 acres and the 398 acres.

In the fall and winter of 1946, and the winter and spring of 1947, steps were taken to secure rights of way for the Laurel Fork spur, a contract was let for construction thereof, and it is contended some work was done in that connection outside the 404 acre lease. Berthy urged Gauley-Eagle to build roads to what is called the Muddlety Front, but it refused to do so until it had the assurance that the railroad company would have rights of way for loading facilities at that point. On May 8, 1947, Dickinson,

Blair and Berthy conveyed to the Baltimore & Ohio Railroad Company such rights of way, being a strip of land 67 feet in width containing 4.77 acres. Following this deed Gauley-Eagle began extending its road to the Muddlety Front, to move its tipple from Beaver Creek to the new site on the railroad right of way aforesaid.

It was after the conveyance of May 8, 1947, that Gauley-Eagle began to insist on a coal mining lease on a larger tract, later fixed at 4700 acres of land covering the southern portion of the 11,000 acres owned by Dickinson, Blair and Berthy, and which included the tracts of 404 acres and 398 acres above mentioned. It may be, that prior to that date, such a lease was within the contemplation of the parties; but Gauley-Eagle was apparently unwilling to make further commitments until the railroad problem had been solved, and this appears to have been done by the deed of May 8, 1947. Thereafter, Gauley-Eagle was willing and eager to negotiate a lease and soon thereafter had its attorney prepare a lease on the 4700 acres for submission to the owners thereof. Callaghan, counsel for Gauley-Eagle, and Dickinson, Blair and Maust had a meeting in Charleston, West Virginia on June 2, 1947, at which the lease prepared by counsel for Gauley-Eagle was discussed, and plans were then made for a meeting of all interested parties to be held in Charleston, West Virginia on June 6, 1947.

The meeting planned for June 6, 1947 was held in Dickinson's office in the Kanawha Valley Bank. At that meeting there were present Dickinson, Blair and Berthy, J. R. Maust, President of Gauley-Eagle, with Callaghan as counsel, John V. Ray, attorney for Dickinson, and J. Hunter McClintic, attorney for Blair. The only writings discussed at the meeting were the proposed lease which had been prepared by counsel for Gauley-Eagle, and one which had been prepared by McClintic. There was a general discussion of the whole matter, some changes in the proposed lease were agreed upon, and it can not be

doubted that at least some of the parties to that conference believed that there had been a full and complete agreement on what the proposed lease would contain, and it is clear that among the others it was understood that no final agreement had been reached. What, if any, agreement was there made, and whether the same became binding and enforceable, is the crux of the matters involved in this suit. We will, later in this opinion, discuss in detail the testimony of the witnesses as to what occurred in the June 6 meeting. Suffice to say at this point, that all agree that there was to be a further meeting on June 18, 1947, and all agree that the attorneys for Dickinson, Blair and Gauley-Eagle were to collaborate in the preparation of a lease which the owners would be willing to sign, and Gauley-Eagle willing to accept, at the proposed meeting to be held on June 18; and it clearly appears from the evidence that they did so.

In this situation, the meeting of June 18, 1947, was held in Dickinson's offices. Dickinson was not present, but was represented by his brother, Charles C. Dickinson. All others who attended the June 6 meeting were present. At some early point in the conference, Gauley-Eagle, by its president, stated that all the terms of the lease that they had met to execute had been agreed upon at the June 6 meeting, to which statement Charles C. Dickinson took immediate exception, and efforts were then made to reach an agreement on a lease. Prolonged discussion did not bring about an agreement. However, negotiations thereon were not terminated at that time. The matter of the preparation of, and the agreement upon a lease, was delegated to counsel for the several parties. Soon after this meeting, Berthy employed Robert S. Spillman as his counsel to represent him in the matter, and the evidence is that counsel for Dickinson, Blair and Berthy collaborated for some weeks in an effort to agree upon a lease which would be acceptable to all interested parties, and that counsel for Gauley-Eagle was advised of the result of their efforts, although it does not appear that he participated with

other counsel in their endeavor to prepare a lease which would be satisfactory to all concerned therein.

All subsequent efforts to reach an agreement on the proposed lease failed. The owners, except Dickinson, who was represented by his brother, met on June 19, but no agreement was reached. There was a meeting on June 20 at which Spillman, Berthy's counsel, was present, with no agreement. This was the last of the negotiations between Gauley-Eagle and the owners. A lease was prepared by Callaghan, counsel for Gauley-Eagle, dated June 21, 1947, which was purportedly signed and acknowledged by Berthy and his wife sometime in September, 1947, and by Blair and wife on October 10, 1947, both subsequent to the termination of negotiations on the lease, and the institution of this suit. Following June 21, 1947, counsel for Dickinson, Blair and Berthy collaborated on a proposed lease. On August 12, 1947, copy of a proposed lease, prepared by the above mentioned counsel, was forwarded to counsel for Gauley-Eagle, but no reply to or comment on said lease was ever received by anyone. On September 4, 1947, Dickinson notified Gauley-Eagle that all negotiations on the proposed lease were terminated and concluded. As a matter of fact, the inability of the owners and Gauley-Eagle to reach an agreement on a lease had been theretofore recognized by Blair and Berthy, for on August 22, 1947, they instituted this suit.

Plaintiffs' bill was filed at September Rules, 1947. It avers the ownership by the plaintiffs and Dickinson of the tract of 11,000 acres of land, its location and general character as mineral land. It sets out an alleged agreement prior to October 24, 1945, to lease to Berthy the coal in the tract of 404 acres lying above an elevation of 2250 feet above sea level, and a written lease agreement, dated October 24, 1945, signed by plaintiffs, but not signed by Dickinson, "on account of certain technical and inconsequential provisions * * * insisted upon, and which were not pursuant to the agreement to the lease theretofore

made * * *." It alleges the assignment by Berthy to Gauley-Eagle of the lease on the 404 acres aforesaid, and the possession of and operation thereunder by the assignee and the expenditures of large sums of money in the operations aforesaid, all with the knowledge and acquiescence of Dickinson; and that a large portion of the coal so leased remained to be mined. The bill then alleges:

"These plaintiffs further aver that in the month of June 1947 they, together with the defendant, John L. Dickinson, negotiated with the defendant, Gauley-Eagle Coal & Coke Company, a lease for coal mining purposes upon approximately 4700 acres of land located in the South and South Central portions of the approximately 11,000 acres, as hereinbefore set forth, which negotiations it then appeared had been consumated to the point of executing and delivering a written lease therefore, upon terms and conditions satisfactory to the owners, but the execution and delivery of which said lease was later renounced and rejected by the defendant, John L. Dickinson. Prior to such renunciation and rejection by the defendant, John L. Dickinson, these plaintiffs are informed and, therefore, aver that the defendant, Gauley-Eagle Coal & Coke Company in reliance thereon, extended its mining operations beyond the boundaries of the original lease of 404 acres, as hereinbefore set forth, and expended other and additional large sums of money in completing the construction of the roadways, sidings and railroad loading facilities, as hereinbefore set forth."

The following allegations appear in the bill concerning the 398 acre tract above mentioned:

"Plaintiffs further aver that in the year 1946 and for considerations then deemed adequate and sufficient, these plaintiffs, together with the defendant, John L. Dickinson, verbally agreed to sell and convey to the plaintiff, J. N. Berthy, Jr., or to his nominees, a part or portion of the lands embraced in these proceedings, containing about

398 acres of surface, and including all seams ·of coal therein above elevation 2005, the coal acreage being estimated at approximately 197 acres, which land was situate on the East side of Laurel Fork, bounded on the North by the Strouds Creek & Muddlety Railroad right of way and on the East and South by the lands of the Tioga Lumber Company. The plaintiff, J. N. Berthy, Jr., relied upon said agreement to sell and convey, so made by the said T. J. Blair, Jr., and John L. Dickinson, but the defendant, John L. Dickinson, now refuses to comply with said agreement or to execute and deliver a deed therefor. Plaintiffs further aver that by reason of said agreement, the plaintiff, J. N. Berthy, Jr., has certain rights and equities in said surface tract of 398 acres and the coal therein as aforesaid, which should be recognized by this Court in these proceedings."

The bill then alleges that the said tract of 11,000 acres of land was susceptible of partition; that the plaintiffs desired that the part of said land to which they might be equitably entitled be assigned and partitioned to them together as one boundary, and that the same should include the 404 acres under lease to Gauley-Eagle, and the 398 acres of surface and certain coal thereunder agreed to be sold to Berthy or to his nominees, "for the protection of their· equities as hereinbefore set forth and recited". The eighth and concluding paragraph of the bill was changed by the filing of an amended bill on December 17, 1947, immediately before the beginning of the taking of testimony in the cause, and the amended bill will be referred to as stating the final position of the plaintiffs and the relief prayed for. In the amended bill it is averred that:

"Plaintiffs further aver that said real estate can be and is susceptible of being so partitioned in kind that these can be assigned and partitioned to these plaintiffs, together, and in undivided interests, a 2/3rds part thereof in value, and to the defendant, John L. Dickinson, another 1/3rd part thereof in value, with due regard for the equities

of these plaintiffs and of the defendants as herein set forth and averred. Plaintiffs further aver that if said land can not be conveniently partitioned in kind that the interests of these plaintiffs would not be promoted by a sale of said land or by any allotment in part and a sale of the residue thereof."

The prayer of the bill is:

"* * * that the rights, interests and equities of the parties hereto be ascertained and adjudicated herein; that said rights, interests and equities of the parties be protected and preserved during the pendency of this suit; that the said real estate be divided between the parties entitled thereto, setting apart to these plaintiffs their undivided interests, together in kind, and that there be granted to these plaintiffs such other and general relief as in the premises may be just and right, and as in duty bound these plaintiffs will ever pray, etc."

At October Rules, 1947, Gauley-Eagle filed its answer to the bill of the plaintiffs, and also its answer praying affirmative relief against the plaintiffs and Dickinson, and process thereon was issued and served. The answer raises no issue on the bill, and the answer praying for affirmative relief seeks the specific performance of an alleged agreement for a lease on 4700 acres of the 11,000 acre tract aforesaid; and alleges the execution of such lease by the plaintiffs and the wrongful refusal of Dickinson to execute the same. The lease executed by the plaintiffs was filed with said answer, and is the lease dated June 21, 1947, hereinbefore referred to. The prayer of said answer is that Dickinson be required to execute a lease identical with that of the lease of June 21, 1947, aforesaid, executed by the plaintiffs; that partition or sale of the 11,000 acres be made subject to its coal operating lease on the 4700 acres aforesaid; and that its leasehold estate be protected; that, in the alternative, if Dickinson be not required to execute said lease, the 11,000 acres be divided and allotted

to the respective owners so that the 4700 acres, covered by said lease, be decreed to the plaintiffs in such manner as to enable them to perform their legal obligation under the lease, aforesaid, as executed by them.

On December 17, 1947, a hearing was held in the suit, and at that time there was filed in the cause the separate answers of Dickinson to the original bill of complaint, and to the answer of Gauley-Eagle praying for affirmative relief; and also his cross bill against Gauley-Eagle, J. R. Maust, Excavations, Inc., a corporation, Bert Jacobson, Blair, Berthy and Lee Matheney, all of whom waived the issuance of process thereon, and to which cross bill the defendants therein, on the same day, filed separate demurrers, in which Dickinson joined. The order filing these pleadings was entered on January 1, 1948, as of December 17, 1947, and the cause was set down for further hearing on January 2, 1948. On December 17, 1947 the plaintiffs filed their amended bill in the cause.

The answer of Dickinson to the original bill denies any agreement on his part to lease the 404 acre tract to Berthy, or to sell to him the 398 acres of surface and certain coal therein; denies that he consented to or acquiesced in the assignment of the supposed lease on the 404 acres to Gauley-Eagle, or that it expended any money in its development with his consent or acquiescence; admits accepting royalty checks from time to time from coal production under said lease, but avers that at all times he made it clear to Berthy that he accepted said checks without waiving his right to have the terms of said lease made satisfactory to him before he would become bound thereby, and avers that he had refused to accept royalty payments under said lease for coal mined since February 18, 1947, until he was advised of the exact area from which the coal represented by such payments had been mined; avers that the terms of the said lease had been violated in many respects, but does not specify the manner or extent of such violations; admits the negotiations in June, 1947, respecting the proposed lease of the tract of 4700

acres, aforesaid, but denies that such negotiations were consummated to the point of executing and delivering the lease thereon for coal mining purposes, upon terms and conditions satisfactory to the owners; denies that Gauley-Eagle, relying on any lease by the respondent, extended its mining operations beyond the boundaries of the tract of 404 acres aforesaid; avers the litigation then pending between the owners and John G. Hoffstot respecting the 398 acres of surface, and the 197 acres of coal thereunder, claimed by Berthy, and denies that Berthy had any rights or equities therein; denies that the tract of 11,000 acres is susceptible of partition in kind, by reason of the uncertainty of the existence of coal or other minerals in the whole of said land, and the lack of tests as to the location of minerals therein, lack of transportation and other considerations; admits that if the said land could be fairly partitioned in kind that the plaintiffs would be entitled to have their shares therein allotted to them together and as one boundary, but denies that they are entitled to have set aside to them the 404 acres or the 398 acres, and alleges that to do so would be inequitable and unfair to the respondent; and also avers that the said 11,000 acres should be sold as a whole and the proceeds divided among the owners thereof. The prayer of the answer is that the questions involving the Hoffstot litigation, the alleged lease on the 404 acres to Berthy, and the alleged equity of Berthy in the 398 acre tract, be first disposed of; that the tract of 11,000 acres be decreed not susceptible of partition in kind; that the same be decreed to be sold as a whole, and for general relief.

The answer of Dickinson to the answer of Gauley-Eagle to the plaintiffs' bill, which prays for affirmative relief against plaintiffs and Dickinson, denies any lease of the 404 acres to Berthy or that respondent agreed to the assignment thereof by Berthy to Gauley-Eagle, and makes the same character of denials as to expenditures, royalty payments and other matters as those made in respondent's answer to the original bill; denies that any agreement on the lease of the 4700 acres was ever effected; denies that

at the conclusion of the negotiations for such lease in June, 1947, the terms of the lease had been satisfactorily agreed upon, or that he had wrongfully refused to execute and deliver a coal mining lease on the 4700 acres to Gauley-Eagle; admits that he had refused and declined to execute and deliver the lease as allegedly agreed upon, and avers that he had never at any time agreed to lease the said land to Gauley-Eagle on the terms and provisions contained in the alleged lease, (presumably the lease dated June 21, 1947) nor on any other terms; denies the right of the plaintiffs to have allotted to them in any partition of the 11,000 acres of land the tracts of 404 acres and 398 acres. The answer pleads the statute of frauds against the claim of Gauley-Eagle, aforesaid. The prayer of the answer is that the alleged lease on the 4700 acres, dated June 21, 1947, and the alleged lease of the 404 acres, dated October 24, 1945, be decreed as void and of no effect.

Dickinson's cross bill alleges matter contained in his answers to the original bill, and to that of Gauley-Eagle, and alleges additional matter respecting coal operations on the 4700 acres and the cutting and removal of timber therefrom. Additional parties were brought into the suit. An injunction against further coal operations on the 4700 acres, or the removal of timber therefrom, was sought, as well as a full accounting for the value of the coal and timber allegedly taken therefrom. Also, that the purported leases on the 4700 acres and the 404 acres, aforesaid, be decreed to be void and of no effect. Demurrers were filed by the defendants to the Dickinson cross bill, on the general ground that the matters set up were not germane to the general purpose of the suit, and not properly involved therein. So far as the record discloses, the trial court has not acted upon these demurrers.

The amended bill of the plaintiffs affects only the last paragraph of the original bill, relating to the partition or sale of the land involved, and the changes made are not important to any question now before this Court. How-

ever, as stated above, we have used the amended bill in stating the position of the plaintiffs in the cause.

The issues were made up on the pleadings in the cause on December 17, 1947, and the taking of testimony in open court began on that day and continued through December 18, 1947, when an adjournment was taken to January 2, 1948, at which time the taking of testimony was resumed, and the same completed on the day following. It should be kept in mind that all the testimony taken was intended to bear on, and be limited to the "titles and interests of the parties in and to the lands in the bill and proceedings mentioned and described and for the partition of which is prayed" as appears from the order of the court entered as of December 17, 1947, referred to above.

A decree of the trial court on the questions presented was entered on February 18, 1948. The interests of the plaintiffs and Dickinson as owners of the 11,000 acres of land were correctly decreed and partition thereof decreed, subject to the provisions of the said decree, if such a partition could conveniently be made. It was then decreed that Gauley-Eagle, was entitled to the relief prayed for in its answer praying for affirmative relief, and to have specific performance, by Dickinson, of the agreement to lease, which agreement the court held had been established, and which lease should be identical with the lease executed by the plaintiffs to Gauley-Eagle, dated June 21, 1947; and provided that unless the same should be so executed, acknowledged and delivered by Dickinson to Gauley-Eagle, within ten days after the adjournment of the court then sitting, such lease should be executed by a special commissioner appointed for that purpose. The plea of the statute of frauds, pleaded by Dickinson, as aforesaid, was overruled, and it was decreed that in any partition of the lands involved, the lease aforesaid, meaning the lease on the 4700 acres, should be fully protected and confirmed to the lessee thereof. The decree then goes on to confirm the lease of the 404 acre tract to Berthy on October 24, 1945, and the subsequent assignment thereof to

Gauley-Eagle, and, we think, in effect, holds Dickinson bound thereby; also that Blair and Berthy had established certain equities entitling them to have their two-thirds interests in the 11,000 acre tract of land allotted to them out of the southernmost portion thereof, if the same could be done without injury to Dickinson; and that such allotment should include the 4700 acres, and the 404 acres and 398 acres, embraced within the boundaries of the 4700 acre tract, unless the 4700 acre tract represented more than the value of two-thirds of the 11,000 acre tract, and in that event, so much of the southernmost portion of the 4700 acre tract as represented two-thirds of the value of the entire 11,000 acre tract, should be assigned to Blair and Berthy. The decree further provided that Gauley-Eagle, being, before partition, the lessee of the 4700 acres aforesaid, and the 404 acres embraced therein, should, after the partition, hold the same of the party or parties to whom such land had been allotted or sold, on the same terms on which, by its lease, it held the same before partition, thus conforming to Section 7, Article 4, Chapter 37 of the Code. The trial court then appointed commissioners to make the partition so decreed, and directed them, after notice to interested parties, to go upon said land and make partition thereof by metes and bounds; but provided that if the commissioners should find that the said lands were not susceptible of partition, or if so susceptible, that the shares of the plaintiff's could not be allotted together, as in the decree provided, they should so report to the trial court, with the facts upon which their conclusion was based. The tract of 398 acres, aforesaid, and the tract of 50 acres, both within the boundaries of the 11,000 acre tract, being in litigation at the date of said decree, the commissioners were directed not to make or file a final report or partition in kind until the termination of such litigation. Dickinson objected and excepted to each and all of the rulings of the trial court as provided in said decree, and it was upon his petition that an appeal therefrom to this Court has been granted.

It is obvious that the decree of the trial court was based upon its holding that Gauley-Eagle was entitled to the specific performance, on the part of Dickinson, of the alleged agreement to lease the 4700 acre tract, on the identical terms of the written lease thereon executed by the plaintiffs, and dated June 21, 1947. It seems quite clear that but for such holding, the court would have entered a different decree with respect to the requirements which, under the decree as entered, the commissioners appointed to make partition in kind, would perform the work assigned to them. The so-called equities of Blair and Berthy, whatever they may be, and if any exist, are almost entirely dependent on the alleged lease of the 4700 acres, which includes within its boundaries the 404 acres and the 398 acres mentioned in the pleadings and in the evidence. Therefore, the first question which we must decide is whether on June 6, 1947, as is contended by Gauley-Eagle, Dickinson entered into a binding agreement with the plaintiffs and Gauley-Eagle to enter into a lease of the 4700 acres to Gauley-Eagle on terms identical with those embodied in the lease aforesaid, dated June 21, 1947, which Dickinson refused to sign, and which the decree appealed from requires to be executed and delivered by him to Gauley-Eagle. If we hold that there was no such binding agreement on the part of Dickinson to make such lease, then the decree entered by the trial court was clearly erroneous, because it was based upon matters which go to the very heart of the rights and interests of the owners of the 11,000 acres involved. That portion of the said decree which provides that the southernmost portion of the tract, including the 4700 acres, should, in any partition in kind, be allotted to plaintiffs, can only be justified, if that furnishes any justification therefor, on the theory that Dickinson had wrongfully refused to execute the lease which the plaintiffs executed on June 21, 1947. If it be held that Dickinson was not required to execute said lease, then the rights of the owners in the 11,000 acres of land are equal, and a partition in kind should be made on the sole basis of the value of the lots assigned to each of the owners.

Before discussing the crucial conference of June 6, 1947, and the preliminary conference which preceded it on June 2, we think it advisable to make a resume' of what had transpired, as between the owners of the 11,000 acres, and the relation of Gauley-Eagle thereto, prior to said conference. It seems clear from the record that when Dickinson, Blair and Berthy acquired said land they immediately began plans for its development, particularly the coal therein. Dickinson first endeavored to interest some large operators without success. Then Berthy was encouraged to make an effort to secure a lessee for some of the property, and finally negotiated with his co-owners for a lease, in his own name, for the coal above an elevation of 2250 feet above sea level, in a tract of 404 acres of land, in the extreme southeast portion of the said tract near McMillion's Creek, the outlet for which was State Highway No. 43, and the loading point for coal produced therefrom was at a point known as Twin Churches on the railroad on Muddlety Creek, some six miles from said land. A written lease for this 404 acre tract was executed on October 24, 1945, by Blair and Berthy, but not by Dickinson, who was then ill and later went to Florida where he remained until the Spring of 1946. Berthy made a verbal transfer of this lease to Gauley-Eagle and it began operations thereon in the fall of 1945. Sometime in 1946, John G. Hoffstot became interested in the purchase of the 398 acre tract aforesaid, and the coal above an agreed elevation, estimated at 197 acres, and claimed to have an enforceable contract for its purchase at one hundred dollars per acre for the coal acreage. Apparently, this 398 acre tract adjoined the 404 acre tract, and was located, at least in part, on Laurel Fork, a tributary of Muddlety Creek. After Berthy had transferred his lease on the 404 acres to Gauley-Eagle, and during the year 1946, he, with the apparent knowledge and acquiescence of Dickinson and Blair, endeavored to interest Gauley-Eagle in expanding its operations. Also, Berthy at one time sought a lease on all of the 11,000 acres south of Muddlety Creek, estimated at 3,000 acres. In connection

with these matters, a plan was developed to construct a road from the 404 acre operation to a point on Laurel Fork, where a tipple was to be located which could be reached from the railroad on Muddlety Creek by building a spur up Laurel Fork. Some work was done on these proposed roads, but the plan was blocked by Hoffstot, because the right of way for the proposed railroad spur passed over the 398 acres which he claimed. Condemnation proceedings were then instituted and dismissed, and finally the proposed plan was abandoned. Sometime early in 1947, a new plan was devised, and that was to locate and construct a loading tipple and coal cleaning facilities at a point on the railroad on Muddlety Creek, a short distance from the mouth of Laurel Fork. Berthy and Gauley-Eagle were the active participants in these plans, and it is quite evident that if these plans were to be consummated a lease on a larger acreage of coal would be required to justify the expenditures involved. It was planned by Gauley-Eagle to move a tipple it owned, located on Beaver Creek in a nearby field, to the new location; but before this could be done it was necessary that there be conveyed to the railroad a strip of land along its right of way, at the point of the proposed tipple, for its location and construction, and for the laying of necessary tracks, all on railroad property. On May 8, 1947, Dickinson, Blair and Berthy conveyed to the Baltimore & Ohio Railroad Company a strip of land 67 feet in width and containing 4.77 acres along its right of way, for the purposes aforesaid. When this conveyance was made, and not until then, Gauley-Eagle demanded a contract for an additional acreage of coal. Up to that date no specific acreage had been agreed upon. Thereafter, in some way, the 4700 acreage was agreed upon, and the same was set off by laying down a line through the southern portion of the 11,000 acres from east to west which set off the 4700 acres lying south of said line, and included both the 404 acre and the 398 acre tracts aforesaid. It is in evidence that Maust, speaking for Gauley-Eagle, stated, in substance, that what he had done up to that date had been in reliance on verbal

assurances to lease, and that he wanted a definite contract before proceeding further. Then it was that the negotiations for the written lease on a defined acreage, and on definite terms and conditions, began. We do not understand it to be contended by anyone that there was an enforceable agreement for a lease on any part of the 11,000 acres, outside the 404 acre tract, aforesaid, at any time prior to the meeting in Charleston on June 6, 1947. Sometime after May 8, 1947, discussion on a lease began, and it was finally agreed that Gauley-Eagle's attorney, Callaghan, should prepare a lease for presentation to the landowners. This he did, and from this point further negotiations began. The paper prepared by Callaghan was the first concrete and written proposal made by Gauley-Eagle for a lease on any particular boundary of land. It was not, as we understand the record, claimed by anyone that Berthy had any authority to bind his co-owners, even if he had assumed to do so; and we do not understand that he ever claimed such authority. Legally speaking the slate was clean, and all parties proceeded in their attempt to agree upon a written lease.

Callaghan prepared a lease sometime after May 8, 1947, and delivered three copies thereof to Berthy. One of these copies was turned over to Blair who took the same to his attorney, J. Hunter McClintic, and asked him to look over the same; but McClintic, instead of doing this, prepared a separate lease. On May 29, Dickinson asked Ray to prepare a lease, but it does not appear that he did so. On or about June 2, 1947 there was a meeting of some, but not all, of the interested parties in Charleston, but nothing was agreed upon more than fixing June 6, 1947, as the date for the meeting to discuss a lease and that meeting was so held.

At the meeting of June 6, 1947, the following persons were present: Dickinson, and his attorney, Ray; Blair, and his attorney, McClintic; Berthy, who was not represented by counsel; and Maust, president of Gauley-Eagle, with Callaghan his attorney. All of the parties there pre-

sent, except Dickinson and Callaghan, have testified in this case. Callaghan's failure to testify may be attributed to the fact that he has appeared as counsel for Gauley-Eagle in this litigation from the beginning; the failure of Dickinson to testify is explained by his condition of health. A statement of his physician was to the effect that it was inadvisable for him to testify. The explanations given as to Dickinson's failure to testify did not satisfy the trial court; but we do not think that the failure of either Dickinson or Callaghan to testify should, in the circumstances, be treated as having any bearing on the decision of this cause.

The witnesses who testified as to what occurred in the meeting of June 6, 1947 do not agree as to what occurred in said meeting. Maust, who first testified in behalf of Gauley-Eagle, referred to many matters and things as to which there is no dispute, and testified as to expenditures made by Gauley-Eagle on the properties involved, and many other matters leading up to that meeting. He testified as to an inquiry made of him by Dickinson, probably at the June 2 meeting, as to expenditures he expected to make in the development of the property, and filed with his testimony as an exhibit a letter dated June 6, 1947, addressed to Dickinson, Blair and Berthy, in which a statement is made of the proposed expenditures, and the value of the equipment then on the job, meaning in particular, as we understand it, the operations on the 404 acres from which coal was then being mined, although he may have meant to include roads and equipment outside the 404 acres. He denies that there was any general discussion of the financial responsibility of his company. He testified that at this meeting two leases were presented for consideration, the lease prepared by Callaghan and a lease which had been prepared by McClintic, at the instance of Blair. There is no denial of this incident, nor that, later on in the discussion, it was agreed that the lease prepared by Callaghan would be used as the basis of the proposed lease. In other words, it was agreed that any

changes or corrections should be made in the Callaghan lease rather than in the lease prepared by McClintic. Maust testified that Dickinson raised the question as to the minimum royalty to be paid. The Callaghan lease having provided for a minimum royalty of $12,000.00 per year, on Dickinson's suggestion the minimum royalty was changed to $8,000.00 for the first year, $16,000.00 for the second year and $24,000.00 for the years following, and this was agreed to. He also stated that Gauley-Eagle had been producing coal from a tract of land adjoining the 404 acres, and transporting the same over that tract, to which practice Dickinson had objected, but agreed to permit such removal for ninety days only. Also that there was some discussion about the right to use timber in mining operations and this, apparently, was agreed upon. Another matter agreed upon, according to Maust was that the notices required to be given under the terms of the lease, were to be given to each of the owners of the 11,000 acres, instead of to Berthy only, as provided in the lease draft. Maust's testimony as to that part of these conversations occurred while all the parties were together in the directors room of the Kanawha Valley Bank. At some stage of the discussion, Maust testified, Dickinson called him into his private office, and discussed the matter of minimum royalties and haulage rights, and probably other matters, and that then Dickinson called the other owners, Blair and Berthy, into his private office, and there told them "we have an agreement here", and afterwards returned to the directors room where counsel for the parties were sitting, and there instructed Ray to take the Callaghan lease and correct the same in accordance with the agreement then made.

Since the testimony of Berthy and Blair was in substantial accord with that of Maust, it would serve no useful purpose to go into the details thereof. Their statements are that they were called into Dickinson's private office and were told by Dickinson that an agreement had been reached, and they testified that the terms of that

agreement were as stated by Maust, namely, in respect to changes regarding mining royalties, haulage rights, timber rights, and matters of agency, etc. They all agreed that there was to be a further meeting on June 18, 1947, at which time the lease was to be executed. They denied that there was any discussion of financial responsibility of Gauley-Eagle, and, in general, their testimony was that, as they understood the result of the conference of that date, there was to be a meeting on June 18 following, at which time the lease, as Callaghan had prepared it, and as the same had been directed to be corrected, would be executed.

Blair's attorney, McClintic, was called as a witness on behalf of Dickinson. His statement is that the matter of correcting the Callaghan lease was turned over to John V. Ray, attorney for Dickinson, who, on that occasion, instructed Ray to make the changes agreed upon. He testified that there was to be a meeting on June 18 following, and in substance stated that the purpose of that meeting, as he understood, was to close the agreement. In answer to the question: "And you left with the understanding that Mr. Ray was to prepare a lease, as you have stated, and the parties were to return later and sign it?" McClintic answered: "I believe the 18th was the day set for — ". He was interrupted by the question: "Coming back to close the agreement?" to which he replied: " — coming back for the closing." He also testified that at the beginning of the meeting Dickinson asked Maust if he had brought him the information he had requested, and that Maust handed Dickinson some papers, and they continued talking, but that he did not hear any of their conversation.

The testimony of Ray, attorney for Dickinson, is quite lengthy, and goes into minute detail as to what occurred at that meeting. His testimony is to the effect that the first thing taken up in the meeting was a consideration of the two leases which had been prepared by Callaghan and McClintic, and that, at this suggestion, it was finally

agreed to use the Callaghan lease as the basis of the lease that might be agreed upon. He says there was considerable discussion as to financial responsibility between Dickinson and Maust, and many other matters were considered such as those mentioned by the other witnesses. That at some point Dickinson left the directors room and went into his private office, and called Maust into that office, where they remained for some fifteen minutes. Ray testified further that while Maust was in Dickinson's room, Blair and Berthy went into an anteroom and could be there observed from a point in the directors room at which he, Ray, was sitting, and that Maust joined them in the anteroom. Later, Dickinson, Maust, Blair and Berthy returned to the directors room, at which time the statement was made as to the points agreed upon, especially with reference to mining royalties, haulage rights, agency, etc., and that he, Ray, was directed by Dickinson, in the presence of the other parties present, to take the Callaghan lease, make corrections therein, and do so promptly; and that it was then agreed to return on the 18th of June for the execution of the lease. The particular points of difference between the testimony of Maust, Blair and Berthy, and that of Ray are in connection with discussion over financial responsibility, and the point of whether or not Blair and Berthy were called into Dickinson's private office. We attach little importance to the latter because, in our opinion, there was an agreement between Gauley-Eagle, as represented by Maust, and the landowners, on that occasion, with respect to some of the matters discussed at that meeting. Undoubtedly there was some discussion about financial responsibility, and that question was in some manner raised, because Maust admits that he furnished Dickinson the information he had requested on that or an equivalent point, and that statement is supported by an exhibit he filed with his testimony, which contains a statement of the expenditures he proposed to make, and the value of the equipment he had available. McClintic recollects this occurrence, but does not know what, if any, conversation was had touching thereon.

The parties left the meeting with the understanding that they would return on June 18. On the day following, Dickinson wrote a letter to Maust, as president of Gauley-Eagle, in which he said:

> "Although there may have been some differences in opinion between you, my associates and myself, I believe that we may be able to satisfactorily adjust our differences in the matter of the lease on our property. My attorney, Mr. John Ray, is now writing a lease and I have requested him to finish it promptly.

> "In relation to your letter of the 6th [the letter above referred to stating the quoted expenditures and value of available equipment] submitted to Mr. Blair, Mr. Berthy and myself, won't you please advise just what your plans are for erection of tipple and extension, and outline the general plan of your proposition, so we may have some idea as to just what your plans are in the matter. I would be glad if agreeable to you, to meet your representative on the ground and go over the proposition with him.

> "I expect to meet you here in my office on Wednesday, June 18th, as we agreed yesterday."

This letter was not received by Maust until June 11, but on that day he wrote Dickinson agreeing to meet him on the property at the store on Muddlety Creek on June 16. On June 13, Dickinson wrote Maust that he would meet him at the point designated, but for some reason did not do so, and instead sent an engineer by the name of Robinson. We refer to this correspondence merely to show that Dickinson was seeking further information as to Gauley-Eagle's plans, and that Maust was entirely willing to discuss with Dickinson, on the ground, what his plans were. If, as a matter of fact, Dickinson had understood that there was an agreement on June 6 to execute the lease as Callaghan had prepared it, subject to changes agreed upon, it is difficult to understand why Maust took pains to

furnish Dickinson further information along the line of his company's ability to efficiently operate the lease if executed.

What followed the meeting of June 6 is, in our view, quite important, so far as it concerns Dickinson, Blair and Berthy, the owners of the land involved. Dickinson instructed his attorney to prepare the lease, taking the Callaghan paper as the basis of the lease he was to present on June 18. Ray took that lease and made substantial changes, and in preparing the lease had the aid and assistance of McClintic, attorney for Blair; and presumably with Blair's knowledge and acquiescence. Berthy at that time had not employed counsel. Dickinson visited Ray on several occasions to make inquiries as to the progress of the lease. Ray took the Callaghan lease, made changes in that lease, or attached riders thereto, and finally on or about the 10th of June delivered the same to McClintic, who, on June 13, sent a copy of the work Ray and himself had done to Callaghan at his office in Richwood, West Virginia. This, while not binding on Gauley-Eagle, indicates the view of Dickinson and Blair on what was intended to be accomplished at the June 18 meeting.

At the meeting of June 18 all of the parties who attended the meeting of June 6 were in attendance except Dickinson. In the meantime, it developed, as it appears from the testimony of Ray, that Dickinson was induced not to further participate in the negotiations over the lease on account of health conditions, and his brother, Charles C. Dickinson, appeared and stated that, while he had no authority to bind his brother, he was there to represent his interests, and make recommendations on the question of the lease. Before any real discussion began, Dickinson was advised by Maust that he had an agreement for a lease with John L. Dickinson, and all agree that Charles C. Dickinson took exception to this statement, and refused to go on with the meeting if it was to be contended that a lease agreement had been made on June 6. Maust, Blair and Berthy, confronted with this situation, determined to

hear what Dickinson proposed, and a full discussion of the entire matter was then had, with no agreement. The lease, as prepared by Ray, was unsatisfactory to Gauley-Eagle, and no agreement was reached thereon. A number of matters were brought up and discussed. The question of financial responsibility was again raised. It was demanded that Gauley-Eagle either deposit or otherwise secure a fund of $300,000.00 which was claimed to be necessary to properly develop the property. The question was raised as to where the proposed tipple was to be placed, and when advised that it was to be located on a strip of land conveyed to the Baltimore & Ohio Railroad Company, objection was made thereto because if there should be a default on the terms of the lease by the lessee, a tipple located outside the boundaries of the lease premises might not be made subject to any claims of the lessor, under the default provisions of the lease. Questions arose as to reservation of rights with respect to the operation of other coal underlying the seam of coal covered by the lease, because the proposed lease only covered the coal in the 4700 acres above an elevation of 2250 feet above sea level. A question arose as to the assignment of the lease to permit other persons or corporations to mine the coal in the lease premises which could only be removed by the deep mining process, as distinguished from strip mining. A question arose as to what is termed a "free coal" provision contained in the lease, to the effect that where in one year sufficient coal has not been mined to cover the minimum royalty paid, coal necessary to make up the minimum royalty might be mined within a limited period there-after, without payment of currant royalty thereon. Other questions were raised and long discussions were had with no agreement, and the parties adjourned the meeting with the understanding that another meeting was to be held by some of the parties on the day following, and by all parties on June 20. A meeting was held on June 19, but neither Maust, Callaghan nor McClintic was present. A meeting was held on June 20 to which all the parties were present except McClintic. At the June 20 meeting,

Berthy appeared with his counsel, Robert S. Spillman, whom he had employed to represent him in the negotiations, after the failure to reach an agreement at the meeting of June 18, and much time was consumed in acquainting Spillman with the progress of negotiations to that date. Nothing was accomplished, and that meeting adjourned with the understanding that Ray, McClintic and Spillman, as attorneys for the respective owners, should endeavor to agree upon a lease which they would recommend that the owners sign. It appears that Ray did most of the work in connection with the effort to prepare this lease, but that he submitted his work to both McClintic and Spillman. Finally, the attorneys agreed upon a lease which they were willing to recommend to their clients, and about August 12, 1947, forwarded a copy of same to Callaghan, attorney for Gauley-Eagle. This lease, as prepared by the attorneys for the owners, was unsatisfactory to Gauley-Eagle, and was never executed. In the meantime, after the meeting of June 18, Callaghan prepared a lease, supposed to be identical with the lease he submitted in the meeting of June 6, with the corrections alleged to have been agreed upon at that meeting, and dated the same June 21, 1947. Subsequent to the institution of this suit, this lease was signed by Blair and Berthy and their wives. We do not think the record disclosed just when this lease was actually signed, but we assume it was after negotiations had ended on the lease submitted by Ray, McClintic and Spillman, in August, 1947. It should be stated here that the contention of Gauley-Eagle has always been, and is now, not that a lease was agreed upon at the meeting of June 6, but that there was an agreement for a lease.

All of the parties seem to have contemplated that there must be a writing. Maust, as representative of Gauley-Eagle, was unwilling to go further after the railroad right of way had been obtained, on May 8, 1947, until he had a definite contract. We can scarcely conceive that business men, of the character as those represented in this controversy, could ever entertain the idea of leasing coal in a large boundary of land, such as is here involved, without

a writing, not only covering the acreage to be leased, the royalty to be paid, both as production royalty and as minimum royalty, and the many other provisions that enter into a coal mining lease as well. An examination of the proposed leases which appear in the record before us illustrates the complexities of a lease for coal mining purposes. The location of the seam of coal, the physical conditions which surround it, and many other things, are varied, and often require special stipulations and agreements. We do not believe that it was ever intended by any of the interested parties that there was to be a consummated coal mining lease of the properties involved in this case except by a writing, signed by the interested parties; and we think the meeting of June 6, 1947, must be appraised with this thought in mind because, as a matter of plain common business prudence, men do not engage in that character of enterprise, involving the expenditures of large sums of money, and promising to extend over many, many years without definite and specific written agreement as to the manner in which the transaction is to be carried through.

When the meeting of June 6, 1947 adjourned, we do not doubt that all of the parties believed that a lease would be signed on June 18. The Callaghan lease was only to be used as the basis of a proposed lease, and it must have been then understood that changes, other than those specifically agreed upon, might be suggested, because the draft of the lease by McClintic submitted at that meeting was quite different from the Callaghan lease. This in itself should have put Maust on notice of the fact that other changes might be proposed. The inquiry made of Maust by Dickinson, on June 7, was further notice that in the matter of financial responsibility, or to put it another way, the ability to properly equip the operation, was in Dickinson's mind, and would have to be considered, and Maust yielded to Dickinson's request for a meeting on the property. It is true, however, that later, on June 18, he made the claim that an agreement had been reached for the execution of the lease, and nothing that he or his counsel

had done since that date has in anywise prejudiced that claim.

The situation is somewhat different as to Blair and Berthy. While they now testify that an agreement was reached to execute a lease on June 6, and they have, since the institution of this suit, executed the lease which, in their view of the case, was agreed upon at that meeting, their present view of the situation seems somewhat different than that entertained by them prior to the breaking down of negotiations, in August, 1947. Up to that time, Blair's attorney, McClintic, presumably at Blair's request, took an active part in the effort to agree upon a lease both before and after the final meeting of the owners on June 20. When the disagreement and difficulties were brought out into the open on June 18, Berthy, instead of supporting Maust in his contentions, employed counsel to bring about an agreement on a lease along the lines claimed by Dickinson and Blair, and his counsel participated in the effort made to agree upon a lease which the owners would sign, a lease entirely different from that which Gauley-Eagle asserted it had the right to demand. We do not make these observations with any intent to criticize the actions of either Blair or Berthy. After the breakdown in negotiations for a lease upon which all the owners could agree, they may have felt that they could best protect their interests by the execution of the lease prepared by Callaghan at the instance of Gauley-Eagle. At any rate, they did so, and their right to do so can not be questioned. However, their action had no effect on Dickinson, who, from the beginning, has stood out against the execution of the lease proposed by Gauley-Eagle, either the one presented on June 6, or as corrected subsequent to the meeting of June 18, being the lease dated June 21, 1947.

As not infrequently happens, both Gauley-Eagle and Dickinson rely on the case of *Brown v. Western Maryland Ry. Co.*, 92 W. Va. 111, 114 S. E. 457. The first point of the syllabus in that case reads:

"Where the parties to an agreement make its reduction to writing and signing a condition precedent to its completion, it will not be a contract until this is done, although all of the terms of the contract have been agreed upon. But where the parties have assented to all the terms of the contract, which are fully understood in the same way by each of them, the mere reference in conjunction therewith to a future contract in writing will not negative the existence of a present contract."

If we follow that case, and we see no reason for not doing so, it is obvious that in the case at bar the determinative question is whether the parties to the lease negotiation intended that any agreement reached thereon be signed by the parties before the same would become binding. If they so intend, then, even if the terms of the proposed writing were agreed upon by all of the parties, they would not be binding until reduced to writing. On the other hand, if there was not such intent, and the terms of the agreement were fully understood in the same way by all of the parties, the mere reference to a future writing would not negative the existence of a binding contract. This is the holding of the *Brown* case, and this principle is, we think, sustained by general authority on the question. In *Virginia Export Coal Company v. Rowland Land Company,* 100 W. Va. 559, 131 S. E. 253, this Court held:

"While a valid contract may be made between parties by memorandum, telegrams and correspondence, care should be taken not to construe as an agreement that which the parties only intended to be a preliminary negotiation. The question in such cases is, did the parties mean to contract by the memorandum of agreement, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up, and by which alone they designed to be bound? Such intention must necessarily be

determined from the circumstances and surroundings appearing in each particular case."

In *Elkhorn-Hazard Coal Co. et al. v. Kentucky River Coal Corporation,* 20 F. (2d) 67, quoting with approval from *Miss. & Dominion Steamship Co. v. Swift,* (Me.) 29 A. 1063, 41 Am. St. Rep. 545, it is stated in the body of the opinion that:

"If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations. If a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

In *Agostini v. Consolvo,* 154 Va. 203, 153 S. E. 676, quoting *Boisseau v. Fuller,* 96 Va. 46, 30 S. E. 457, with approval, it is stated in the body of the opinion:

" 'The whole question is one of intention. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. If though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstance that the parties do intend a formal contract to be

drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement.' "

And in *Atlantic Coast Realty Co. v. Robertson's Ex'r.*, 135 Va. 247, 116 S. E. 476, it is stated in the body of the opinion that:

"This rule of law, presumption or rule of evidence, is certain and well established. Expressed differently, it may be said that when it is shown that the parties intend to reduce a contract to writing this circumstance creates a presumption that no final contract has been entered into, which requires strong evidence to overcome."

The cases of *Alexandria Billiard Co. v. Miloslowsky,* 167 Ia. 395, 149 N. W. 504; *Spinney v. Downing,* 108 Cal. 666, 41 P. 797; *Universal Prod. Co. v. Emerson,* 6 W. W. Harr. (36 Del.) 553, 179 A. 387; *El Reno Whse. Gro. Co. v. Stocking,* 293 Ill. 494, 127 N. E. 642; *Elks v. North State Insurance Co.,* 159 N. C. 619, 75 S. E. 808; *Metzler v. O. J. Barnes Co.,* 58 N. D. 455, 226 N. W. 501; *Strong & Trowbridge Co. v. H. Baars & Co.,* 60 Fla. 253, 54 So. 92, cited by appellants, are, we think, in accord with this principle, and we have not been cited to, nor have we found, any authority in conflict therewith.

Considering the entire record, we reach the conclusion that after May 8, 1947, when the right of way on Muddlety Creek was conveyed to the Baltimore & Ohio Railroad Company by the landowners, it was intended by all the parties that a written lease was to be negotiated on the 4700 acre tract here involved. Maust stated his unwillingness to proceed further without a definite contract. To that point he had proceeded on oral assurances, but as any prudent man would have done in the same circumstances, he was unwilling to make further commitments or expenditures without a definite lease. Everything indicates that the landowners recognized the correctness of his demand. In this situation, we think it fair to assume that

when the parties met on June 6, 1947, it was with the understanding that a written lease, satisfactory to all, was to be executed. In our opinion, what there occurred was in furtherance of the paramount purpose in mind, that is to agree upon and execute a written lease. There was an agreement on specific points as to what the lease should contain; but no agreement on all the provisions of the lease. There was no agreement on the form of the lease even as to the matters agreed upon. Ray was designated to put in written form the matters agreed upon, but we do not believe it was intended he should be limited in his work to those points of the proposed lease. We think it was intended that he should prepare an entire lease, and submit the same at the June 18 meeting then agreed upon. This he did, and when Gauley-Eagle was unwilling to accept the lease prepared by him, further negotiations began which continued through June 20, as between all the parties, and between the owners and their counsel until sometime in August following. Therefore, the holding of the trial court that at the meeting on June 6, 1947, there was an agreement to execute a lease equivalent to the lease which Callaghan subsequently prepared on June 21, 1947, is not, in our opinion, sustained by the evidence and circumstances of the case. We do not believe that anything definite and final, covering the entire lease, was agreed upon at the June 6 meeting. The potential final agreement on, and the closing of the transaction was, in our opinion, postponed until June 18, 1947, but never consummated.

But even if it was not intended by the parties to make the reduction to writing of the proposed lease and its execution as a condition precedent to its completion as a binding contract, we do not believe there was a complete agreement on the terms of the entire lease at the meeting on June 6, 1947. The lease proposed by McClintic, at the instance of Blair, was considered, and was objected to by Gauley-Eagle as unworkable and otherwise unacceptable. But it served to raise questions as to the acceptability of the lease which Callaghan had submitted. The agreement

to use the Callaghan lease as the basis of the lease which Ray was instructed to prepare, did not amount to an acceptance of that lease on the part of the owners. As to the specific points agreed on at the June 6 meeting, no question was raised at the June 18 conference; but the questions raised at the latter meeting brought out the several questions on which there had been no specific discussion at the earlier meeting, and, therefore, no agreement. The questions raised at the June 18 meeting were, for the most part important, and questions which the owners had the right to have settled by written stipulations to be contained in the proposed lease. In particular, the questions of financial responsibility; construction of tipple on land outside the lease premises; the assignment of the lease as to coal which could only be mined by deep mining methods; and reservations as to mining of coal underlying the coal lease, were all matters of substance which should be covered in a lease of the character proposed. So far as this record discloses, none of these matters, unless it be that of financial responsibility, was discussed or agreed upon at the June 6 meeting. In our opinion, the question of financial responsibility was not settled at the June 6 meeting. The actions of both Dickinson and Maust, immediately following that meeting, so indicate. The record shows that Dickinson attached great importance to this matter. When Berthy was seeking a lease of the land south of Muddlety Creek, Dickinson, by a letter appearing in the record, indicated that such a lease could not be successfully operated without an expenditure of $300,000.00. His estimate may have been too high, but it is clear that he did not want to lease the property to anyone who was not in a financial condition to furnish the equipment necessary for its successful development. It does not seem probable that he intended on June 6 to waive that requirement. Many other matters could be mentioned, tending to show that there was no agreement on June 6 on all essential provisions of the proposed lease. It is elemental law that without a meeting of minds on the terms of a proposed agreement, by the parties thereto, there is no contract. We do not think there was a **meeting**

of the minds of the landowners and the representatives of Gauley-Eagle in the meeting of June 6, on the entire lease then being negotiated, and, in our opinion, the trial court was in error when it held that there was such an agreement, and when, by the decree appealed from, it required Dickinson to execute to Gauley-Eagle a lease identical in form with the lease dated June 21, 1947, which Blair and Berthy had executed subsequent to the institution of this suit.

We are not unmindful of the rule which requires us to give weight to the findings of a trial court on a factual question. We do not think that by our holding we violate that rule. Here, in our opinion, the trial court gave to the facts proved an interpretation which the law does not justify, and, in so holding, we decide questions of law and not questions of fact.

Counsel for Dickinson and Gauley-Eagle raised and discussed the questions of the applicability of the statute of frauds, Code, 36-1-3, and the circumstances and conditions under which it may be avoided, or held inapplicable. In our view of this case, neither question is here involved. The statute is applied in cases where an oral contract to sell real estate, or to lease the same for a term of more than one year has been established. Such contract is unenforceable, under the statute, unless there has been a clearly proved agreement, accompanied by possession thereunder, and valuable improvements placed on the property in reliance on the oral agreement or otherwise so far executed as to make it inequitable to refuse specific performance. Clearly, the establishment of a definite oral agreement by clear proof is a prerequisite to the enforcement thereof by reason of possession, expenditures or otherwise. This has always been the law in this jurisdiction. In *Campbell v. Fetterman's Heirs,* 20 W. Va. 398, in speaking of a case where there had been an oral agreement, accompanied by payment of purchase money, possession and improvements, it was held in the body of the opinion as follows:

"* * * That in such cases it must appear: 1st. That the parol agreement relied on is certain and definite in its terms: 2nd. The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved; and 3rd. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the purchaser, and place him in a situation which does not lie in compensation at law."

In *Gallagher v. Gallagher,* 31 W. Va. 9, 5 S. E. 297, speaking of the same character of cases, this Court held:

"* * * therefore, a purchaser seeking the performance of such agreement must be able to show clearly not only the terms of the contract, but also such acts and conduct of the vendor as a court would hold to amount to a representation that he proposed to stand by his agreement, and not avail himself of the statute to escape its performance; and also that the purchaser, in reliance on this representation has proceeded, either in performance or pursuance of this contract, to so far alter his position as to incur 'an unjust and unconscientious injury and loss,' in case the vendor is permitted after all to rely upon the statutory defence.* * *"

In the same case in point 1 of the syllabus it was held that:

"In a suit by the purchaser for the specific execution of a parol contract for the sale of land, the plaintiff must establish the contract alleged in his bill by a clear preponderance of evidence. If the evidence is conflicting, and it is not clear that a contract was in fact made, the court should dismiss the bill."

To the same effect is the case of *Stone v. Hill,* 52 W. Va. 63, 43 S. E. 92. In *Oberman, Trustee v. Red Rock Fuel Company, et al.,* 83 W. Va. 531, 99 S. E. 66, this Court held:

"The lessee of a coal mine under a parol agreement, the terms of which are clearly proven,

entered into by the authorized agents and officers of a coal mining corporation, who has been put in possession of the property by them and has made valuable, permanent improvements thereon, under the assurance that a formal lease, in accordance with the parol agreement, would be shortly thereafter, formally executed by the company, is entitled to have the same specifically enforced by a court of equity, the legal remedy in such case being inadequate."

This case affords strong support for the theory of the right to have specific performance where the contract has been agreed upon, but it is also authority for the proposition that "terms agreed upon should be clearly proven". We do not think it can be successfully contended that any parol contract for the sale or lease of land has ever been specifically enforced in this State in cases other than those where the agreement upon which possession, improvements, etc. are based has been clearly proved.

Having held that Gauley-Eagle has failed to establish a definite oral contract for the lease of any land for coal mining purposes, or an agreement to make such a lease, it follows that neither the alleged possession of, nor the expenditures on, the land here involved can be used as an aid in enforcing an alleged oral contract which we have held was never made. In other words, Gauley-Eagle is not entitled to rely on its alleged possession of and expenditures on the 4700 acre tract of land here involved as being proper circumstances for taking the agreement out of the statute of frauds, and making the same enforceable until it has been clearly proved that an oral contract for a written lease had been made, under which possession and expenditures, in reliance thereon, could be justified. In this case, there being no clear agreement to lease the 4700 acres here involved, neither the statute of frauds nor the avoidance thereof come into the picture.

The plaintiffs, Blair and Berthy, are entitled to have their shares of the 11,000 acres of land partitioned be-

tween themselves and Dickinson, and, if partition can be conveniently made in that way, to have their shares in said land laid off together. Code, 37-4-2. It is provided by Code, 37-4-1 that in the exercise of a court's jurisdiction to partition land it "may take cognizance of all questions of law affecting the legal title, that may arise in any proceedings", and this has been held to justify full inquiry as to ownership of and interest in the land proposed to be partitioned. It is provided by Code, 37-4-7, that:

> "Any person who, before the partition or sale, was lessee of any of the lands divided or sold, shall hold the same of him to whom such land is allotted or sold, on the same terms on which, by his lease, he held it before the partition."

These references are made partly because of the existence of a lease on the 404 acres held by Gauley-Eagle, as the assignee of Berthy, signed by Blair and Berthy only, but alleged to be binding on Dickinson, and a claim made by Berthy that he is entitled to the specific performance of an alleged agreement by Dickinson and Blair to convey to him the surface of the 398 acre tract of land, and the coal therein above the elevation of 2005 feet above sea level, both of said tracts lying within the boundaries of the 4700 acre tract, aforesaid. These matters are set up in the plaintiffs' bill and amended bill; and although Berthy does not ask specifically for the specific performance of his alleged agreement, there is an allegation in the bill that:

> "Plaintiffs further aver that by reason of said agreement, the plaintiff, J. N. Berthy, Jr., has certain rights and equities in said surface tract of 398 acres and the coal therein as aforesaid, which should be recognized by this Court in these proceedings."

In connection with both the 404 acres and the 398 acres, the bill alleges:

> "Plaintiffs further aver that the said real estate so owned by them is, as they believe, sus-

ceptible of partition among them and the defendant, John L. Dickinson; that these plaintiffs, T. J. Blair, Jr. and J. N. Berthy, Jr., desire that there be assigned and partitioned to them together as one boundary that part or portion to which they are equitably entitled, which they believe and, therefore, aver should include the 404 acres under lease to Gauley-Eagle Coal & Coke Company, and the 398 acres surface, together with certain coal as agreed to be sold to the said plaintiff, J. N. Berthy, Jr., or to his nominees, all for the protection of their equities as hereinbefore set forth and recited."

The decree of the court covering these contentions has been quoted in this opinion. As will be noted, it makes no finding as to Berthy's claim to the 398 acres, and the lease of the 404 acres is recognized and upheld as binding to the same extent as the same was binding before the partition then decreed to be made. It may be questioned whether the decree did not leave open the question of Dickinson's contention that he was not bound by the lease of the 404 acres made to Berthy by the lease of October 24, 1945 aforesaid. But, if the decree of partition was intended to uphold said lease as to all parties thereto, we think the court's ruling on that point was correct. It is clearly established that Dickinson accepted royalty payments for coal mined from the 404 acres from early in 1946 up to February 18, 1947. True, he did so with reservations as to the form of the lease, but it was his duty and obligation to press his objection thereto promptly so that expenditures on the leased premises by the lessee might not be endangered. He could not stand by and permit such expenditures and operations, and thereafter repudiate the lease after failure to take timely action to determine his rights in respect thereto. We think he is now estopped from questioning the lease which Blair and Berthy signed, and under which Gauley-Eagle has operated since late in the year 1945. Any partition of the 11,000 acres should recognize the 404 acre lease as binding on all the owners thereof. The record discloses that originally about 55

acres of coal was covered by said lease, of which only 22 acres remained unmined. It would simplify the partition if it should be decreed that each of the owners of the 404 acres are entitled to a 1/3 share of the royalties accruing under said lease, until the coal covered thereby is exhausted; but as we desire to leave the trial court free to exercise its judgment on the details of the partition, we make no ruling on that point.

In view of our decision on the proposed lease of the 4700 acres, it is not necessary to comment on the question raised as to whether land under lease for coal mining purposes can be partitioned, other than to say that Code, 37-4-7, quoted above, would seem to imply that such a partition can be made. However, we apprehend that the making of such a partition would depend, to a very great degree, on whether or not the interests of all the owners of the land being partitioned could be protected. The polar star in any partition is to do justice to the interested parties and we do not believe any hard and fast rules can, or should, be laid down covering all cases of that character.

The rights of Berthy, if any, in the surface of the 398 acres, and certain coal thereunder, have not been determined, and we do not believe that on the pleadings so far filed they can be determined. However, there is sufficient showing in the case to warrant and require a settlement of this question, on proper pleadings, before any partition of the 11,000 acres be made.

There are many provisions of the decree of February 18, 1948, relating to the details of the partition decreed which are, in themselves, unobjectionable; but that decree being based on the trial court's holding that a lease on the 4700 acre tract had been legally effected, which holding we hold to be erroneous, we think that the decree of February 18, 1948 should be reversed and set aside in its entirety, so that a proper decree of partition may be entered which will provide for a partition of the 4700 acres, along with the remainder of the 11,000 acre tract,

free of any lease or other encumbrance, but subject to what the circuit court may decree in respect to the tracts of 404 acres and 398 acres, aforesaid, and such will be the order of this Court.

The decree of the Circuit Court of Nicholas County, entered on February 18, 1948, is reversed and set aside, and this cause is remanded to said court for further proceedings touching the partition or sale of the 11,000 acre tract of land, described in the pleadings in this cause, free of the alleged lease on a tract of 4700 acres thereof, set up herein; and such partition shall be made in conformity with the opinions herein expressed, so far as they apply thereto, and otherwise as required by law.

*Reversed and remanded.*

KENNA, JUDGE, dissenting:

The mandate of this Court reverses the decree of the Circuit Court of Nicholas County entered on the 18th day of February, 1948, and remands the cause to that court "* * * for further proceedings to be had therein according to the principles stated and directions given in the written opinion aforesaid * * *." The opinion referred to directs the circuit court to proceed with the partition or sale of the 11,000-acre tract "free of the alleged lease on a tract of 4700 acres thereof, set up herein;". A lease on the 4700 acres had been drawn to be executed by T. J. Blair, Jr., J. N. Berthy, Jr., John L. Dickinson and their wives, Dickinson had refused to execute, but Blair and Berthy and their wives had executed and delivered the lease to Gauley-Eagle Coal & Coke Company and its validity and effect as to their two-thirds interest in the 4700 acres is not under attack by allegation or proof in this proceeding. Consequently I believe that this Court committed error by ordering the main boundary partitioned or sold "free" of the lease in question.

I otherwise disagree with the majority holding because in my opinion upon final submission in the Circuit Court

of Nicholas County the controversies involved were based clearly upon issues of fact. This Court does not on principle reverse a lower court on a fact finding matter unless that court is clearly wrong. To the contrary, upon an examination of the complete record in my opinion in this matter the trial court was clearly right.

In order to attempt clarification, an abbreviated statement of the pleadings is necessary.

The bill of complaint filed in the Circuit Court of Nicholas County by T. J. Blair, Jr., and J. N. Berthy, Jr., against John L. Dickinson and Gauley-Eagle Coal & Coke Company, after alleging that the plaintiffs and John L. Dickinson owned in fee 11,000 acres in Hamilton District, that county, the derivation of title, out sales and encumbrances, none of which is in contest here, alleges that on the 24th day of October, 1945, the plaintiffs, together with John L. Dickinson, leased to J. N. Berthy, Jr., all the coal above a level of 2250 feet in a tract of 404 acres within the principal boundary; that the lease was reduced to writing and executed by Blair and Berthy and their wives but not by John L. Dickinson, who refused to sign, due to certain technical objections not included in the lease as agreed to by him, Blair and Berthy; that J. N. Berthy transferred the lease in question to Gauley-Eagle Coal & Coke Company which has since, in grading roadways and installing machinery and equipment, expended a very large sum of money in preparing to produce and in producing merchantable coal under the terms of its written lease and has paid and continues to pay rents and royalties thereon to John L. Dickinson and to the plaintiffs. The bill of complaint further alleges that in June, 1947, they, together with the defendant, John L. Dickinson, negotiated with Gauley-Eagle Coal & Coke Company a lease for coal mining purposes upon approximately 4700 acres of land, the boundary of which includes the 404 acres then under operation by Gauley-Eagle, and that after having reached a verbal agreement upon the terms and conditions of the proposed lease Gauley-Eagle Coal & Coke Company, in

reliance upon the agreement of lease, entered upon and took possession of the 4700-acre tract, extending its operation beyond the boundaries of the original 404-acre tract leased by it, expending additional large sums of money in the construction of roads, railroad sidings and railroad loading facilities. The bill of complaint further alleges that in the year 1946 the plaintiff, together with the defendant, John L. Dickinson, orally agreed to sell and convey to J. N. Berthy, Jr., or his nominee, 398 acres of surface and coal above the level of 2005 feet, upon which agreement J. N. Berthy, Jr., relied and with which John L. Dickinson has since refused to comply. The bill of complaint prays that the interests and equities of the plaintiffs and John L. Dickinson, together, with Gauley-Eagle Coal & Coke Company, be settled and determined, and that the land in question may be equally divided in kind if possible and if not, sold and the proceeds distributed.

Gauley-Eagle Coal & Coke Company filed an answer and cross bill alleging that after the execution and assignment of the lease upon the 404-acre tract it had proceeded to expend a large sum of money in grading and constructing all-weather rock roadways, in building a side track and ramp, and in purchasing machinery and equipment; that it had mined and produced a large quantity of coal upon which it had paid royalty to the two plaintiffs and to John L. Dickinson, who had been fully informed concerning the development and the operation of the leasehold by the defendant, Gauley-Eagle, which had received their approval. The cross bill alleges that, after operations were begun on the 404-acre tract, the three owners of the 11,000 acres of coal caused to be laid out and described by metes and bounds a part of their principal boundary containing 4700 acres which acreage embraced and included the 404-acre tract. The cross bill alleges that the 4700-acre tract was located and laid off for the purpose of leasing it to Gauley-Eagle and that in recognition of the fact that more convenient and closer loading facilities would be necessary in the more extensive operations demanded by the larger tract, the owners Blair, Berthy, Dickinson and

their wives, on May 8, 1947, conveyed to The Baltimore and Ohio Railroad Company 4.77 acres for the purpose of locating thereon a railroad siding, restricting its use exclusively to the parties of the first part and their successors and assigns. It is alleged that the conduct and promises of the three owners induced and persuaded Gauley-Eagle to expend large sums of money in building a siding, tipple and roadways and otherwise preparing to produce coal from the 4700-acre boundary outside the 404-acre tract. The cross bill alleges further that in the month of June, 1947, Gauley-Eagle negotiated with the three owners a lease upon the 4700-acre tract under the terms and conditions satisfactory to and accepted by them, John L. Dickinson expressly stating to the President of Gauley-Eagle that the terms of the lease were satisfactory to him and that it was unnecessary for Gauley-Eagle to be represented by counsel in further negotiations.

After alleging that John L. Dickinson had wrongfully refused to sign the lease, which was executed and delivered to Gauley-Eagle by both Blair and Berthy and their wives, a copy being attached as an exhibit, the cross bill proceeds to pray that John L. Dickinson be required to specifically perform his agreement to execute that paper and that a partition in kind or by sale that may be accomplished in this proceeding be made, subject to the lease of the described boundary to Gauley-Eagle, or, in the alternative, that the boundary so leased be embraced within the consolidated boundary assigned to Blair and Berthy and that the interest and equities of Gauley-Eagle be otherwise fully protected.

At a special term held January 1, 1948, an order was entered which recites the regular maturing of the cause upon the original bill and the cross bill of Gauley-Eagle, grants leave to the plaintiffs to file without objection an amended bill of complaint, files the answer of John L. Dickinson to the original and amended bills of complaint, his answer to the cross bill of Gauley-Eagle, to which the plaintiffs replied generally, and files his cross bill naming

J. R. Maust, Excavators, Inc., Bert Jacobson and Lee Matheney, all of whom appeared, waiving the formal maturity of Dickinson's cross bill as to them, to all of which various joint and separate demurrers were filed. Not passing upon the demurrers submitted, the court, by agreement of counsel, proceeded to take testimony in open court, not completed on that day. The foregoing order was entered *nunc pro tunc* as of the seventeenth of December, 1947.

Dickinson's answer to the bill of complaint, after admitting its formal allegations, denies the lease of the 404 acres to J. N. Berthy, Jr., alleging in connection therewith his critical illness beginning August 5, 1945, and his absence in Florida from December 3 of that year until early in the following May. It is alleged that on account of its terms he declined to execute, denying that a lease in writing was delivered to Berthy, and also that Gauley-Eagle was placed in possession of the premises described in the bill with Dickinson's consent or acquiescence. The answer goes on to deny that Gauley-Eagle has made valuable improvements and has installed valuable equipment necessary to its mining operations. It alleges, on information and belief, that Gauley-Eagle does not own any equipment or machinery now on the 404 acres; and that the roadway and improvements have been constructed by Excavators, Inc., and Bert Jacobson; it is denied that either Gauley-Eagle or Excavators, Inc., has produced a substantial amount of coal from the 404-acre tract, alleging that coal in the adjoining tracts, known as the Catlett and Groves land, has been hauled and transported over that tract to the railroad; it is admitted that the respondent has received checks in payment of royalty for coal produced from the 404-acre tract, but is alleged that they were accepted accompanied by his statement that he was not bound by the lease, and that later respondent refused to accept checks from J. N. Berthy, Jr., not Gauley-Eagle, because Berthy would not state positively that they were in the payment of royalty for coal produced from the 404-acre tract and no other land owned in part by respondent.

The answer further alleges that it is true that during the months of June, July and August, 1947, the complainants and respondent negotiated with Gauley-Eagle Coal & Coke Company concerning the terms of a lease proposed to be executed to that company on the southern boundary of the main tract. It is denied that Gauley-Eagle, in reliance upon any lease agreement by respondent, extended its mining operations beyond the 404 acres and expended additional large sums of money thereby. It is alleged that respondent cautioned Gauley-Eagle to suspend said work. Respondent is advised and believes that Gauley-Eagle, Bert Jacobson, and Excavators, Inc., wrongfully and willfully mined coal beyond the boundaries of the 404-acre tract. The answer denies the agreement to sell to J. N. Berthy coal above the 2005-foot elevation in the 398 acres, stating that at that time that boundary was under litigation in a proceeding brought by John H. Hoffstot seeking specific performance of an agreement to convey to him the named boundary, J. N. Berthy having refused to agree to convey to Hoffstot because the agreement did not include the reservation of a right of way on Laurel Creek, the answer alleging that Blair and Dickinson had offered to convey to Berthy the 398 acres at the same price that was contended for by Hoffstot, provided that he, Berthy, would finance the Hoffstot litigation and would place in escrow the purchase price accompanied by a deed, both to be delivered if Hoffstot failed in his contention, the case then being upon appeal and to be submitted at Charlotte, North Carolina, in the 1948 January term. The answer alleges that the only part of the entire boundary prospected for coal is the 404-acre tract, the 398-acre tract, and land lying along the west bank of Laurel Creek, that only the southern part of the 11,000 acres is served by a railroad, and that consequently the entire boundary is not susceptible of partition in kind, even subject to the outcome of the Hoffstot case. The respondent therefore prays that the tract may be ordered sold and the proceeds equitably distributed among the three owners.

Dickinson's answer to the cross bill of Gauley-Eagle, after denying that he executed or approved the lease to Berthy of the 404 acres and at any time assented and agreed to the assignment thereof by Berthy to Gauley-Eagle, denies that Gauley-Eagle has expended large sums of money in providing road transportation, a railroad siding, ramp and loading facilities, or has been begun and since continued large scale operating for coal upon the land in question. It is alleged that Gauley-Eagle does not own any of the equipment or machinery on the 404 acres; that it is owned and the roads were constructed by Excavators, Inc., and Bert Jacobson. Respondent denies knowledge of the various transactions between Berthy and Gauley-Eagle and Excavators, Inc., and denies that he has ever approved of the conduct thereof. It is denied that Dickinson, his agents or engineers have inspected and approved the operations of Berthy, Gauley-Eagle and Excavators, Inc., on the land and denies that he has ever agreed to lease to J. N. Berthy, Jr.; admits that he has received certain checks representing tonnage royalties for coal produced from the 404 acres, but that he has always done so without waiving his right to have the terms of the lease made satisfactory to him; that strip mining operations were suspended February 18, 1947, and that respondent has accepted no checks from Berthy since that time. The answer denies that the respondent, Blair and Berthy caused the 4700 acres to be laid off; denies that the owners conveyed to The Baltimore and Ohio Railroad Company land for a railroad siding for the service of the 4700-acre tract to be operated by Gauley-Eagle. It does not allege for what use the siding was to be constructed. It is denied that respondent had promised a lease which induced Gauley-Eagle, at tremendous expense, to construct a railroad siding and to purchase and construct thereon a coal tipple with all necessary equipment and to construct a stone based all-weather roadway in connection with that service. It is denied that respondent has negotiated with Gauley-Eagle, together with Blair and Berthy, a lease upon terms represented by the owner to Gauley-Eagle to be satisfactory to them. Respondent ex-

pressly denies his statement in the June negotiations that they had reached an agreement and alleges that he has at no time agreed upon the terms and provisions of the coal mining lease to Gauley-Eagle. It is alleged, on information and belief, that Blair and Berthy and their respective wives did not execute and deliver to Gauley-Eagle a lease in the form of a copy filed with the answer of Gauley-Eagle. After praying discovery in answer to four queries largely evidential, the answer prays that the lease dated June 21, 1947, upon the 4700-acre boundary and that dated October 24, 1945, upon the 404-acre tract, may be held void and of no effect.

The cross bill of John L. Dickinson against the plaintiffs, T. J. Blair, Jr., and J. N. Berthy, Jr., and against Gauley-Eagle Coal & Coke Company, J. R. Maust, Excavators, Inc., a corporation, Bert Jacobson and Lee Matheney, after alleging that the purpose of the proceeding is to procure partition of the 11,000-acre boundary, confirmation of the lease of October 24, 1945, upon the 404-acre tract, to procure specific performance of the alleged oral lease by Dickinson of the 4700-acre tract, and of the agreement to convey to Berthy the 398-acre tract, complains that J. N. Berthy, Jr., Gauley-Eagle, J. R. Maust, Excavators, Inc., Bert Jacobson and Lee Matheney have unlawfully mined and removed coal and timber from the said tract of 11,000 acres. Dickinson's illness commencing August 5, 1945, his trip to Florida, and his return in early May, 1946, are alleged, coupled with the fact that upon his return the lease of the 404-acre tract to Berthy was submitted to him for approval and execution, which he declined due to his disagreement with its terms. His subsequent receipt of royalty checks, with the denial that the 404 acres were under lease from him, is admitted, and his subsequent refusal to accept royalty checks, unaccompanied by a statement in writing to the effect that the coal removed was from the 404-acre tract and not from another part of the 4700-acre tract, is asserted. It is alleged that in December, 1946, complainant learned for the first time that Gauley-Eagle was conducting a strip mining

operation upon the 404-acre tract under a purported assignment from Berthy to which complainant had not consented, the nonassignability provision being absent from the written lease submitted to complainant for execution being one of the reasons that he had refused to become a party thereto. It is alleged that the actual operations upon the 404-acre tract were conducted by Excavators, Inc., and Bert Jacobson, the president of that company, upon agreement with Gauley-Eagle and J. R. Maust at an agreed price per ton to be paid by Gauley-Eagle. It is alleged that from February 18, 1947, operations on the 404-acre tract were suspended and not resumed for five months, during which period coal was unlawfully transported across the 404-acre tract from the Catlett and Groves land without the consent of complainant. It is alleged that Maust, Gauley-Eagle, Excavators, Inc., and Jacobson have unlawfully removed coal from certain parts of the 11,000-acre tract not within the boundary of the 404-acre tract covered by the alleged lease to J. N. Berthy, Jr., without the knowledge and consent of Dickinson, and that they now are indebted to Dickinson for one-third of the market value of the quantity of coal thus removed. It is alleged further that Berthy has caused a large amount of timber to be so removed under an arrangement with Lee Matheney to which complainant has not consented, but that Berthy and Matheney are indebted to complainant for one-third of the market value thereof. It is alleged that complainant first learned of operations within the 4700 acres outside the 404-acre tract during the negotiations between complainant, Berthy and Blair, as landowners, and Gauley-Eagle as prospective lessee, for a lease on the 4700-acre boundary; that complainant thereupon advised Maust that he had not consented to said operations, and that Maust and Gauley-Eagle and any one conducting that sort of operation had no right to do so. It is further alleged that on June 20, 1947, during the course of such negotiation, complainant's representative learned that such operations were continuing and again notified Maust that those conducting them

were doing so at their own risk and, in the absence of an agreement being consummated, would be held liable therefor. It is alleged that the cutting of timber and removal of coal is continuing in spite of frequent admonitions and notices to cease. After alleging that Maust is President of Gauley-Eagle and Jacobson the President of Excavators, Inc., the companies being subject to their exclusive management and control and therefore that the unlawful conduct of those two companies is in fact the willful conduct of their presidents, appropriate injunctions are prayed for, together with discovery and relief for the unknown damage resulting to complainant from the unlawful removal of coal and timber; that the alleged lease, dated October 24, 1945, purported assignment thereof by Berthy to Gauley-Eagle, as well as the purported lease to Gauley-Eagle dated June 21, 1947, may be held void and of no effect. Note that this cross bill prays that the lease to Gauley-Eagle be held absolutely void and not void alone as to the Dickinson interests. There are no allegations to sustain this prayer. The prayer concludes by asking a reference to a commissioner in chancery for the purpose of settling several accounts alleged.

It will be seen from the foregoing resume of the pleadings, which omits the unlimited number of exhibits in the form of leases, maps, conveyances and letters, that the ground work upon which this cause turns is a rather complicated and, in certain instances, a self-contradictory issue of fact, all turning upon an *inter partes* controversy concerning the title and rights, including equities, sought to be partitioned as parts of the same parent title, partition of which is prayed.

In order to determine the existing relationship between the three owners it is necessary to amplify the statement of facts contained in the majority opinion. Before December, 1944, the 11,000-acre tract, subject to the usual exceptions in boundaries of that size, which are of no consequence here, was owned by Muddlety Coal Land Company. That company existed for the primary purpose of

owning in fee simple and leasing coal land. The ownership of its stock was equally divided among Blair, Berthy and Dickinson. It had leased several small boundaries for coal mining purposes. Any two of the three stockholders had absolute control of its affairs. At that time Dickinson asked Blair and Berthy to consent to having the land conveyed to the three as individuals in like proportion to their stock ownership and to surrender the corporation's charter, advancing his, Dickinson's, tax difficulties as a reason. This was done evidently with the notion that the individuals would carry on their business for the same purpose and in the same manner as had the corporation.

Immediately after the transfer took place the owners manifested their desire to have their land developed by more substantial operations, John L. Dickinson taking the lead. Two or three negotiations undertaken by Dickinson in behalf of himself and the other two owners came to naught. Berthy then stepped into the picture and he testifies without contradiction that he had Dickinson's express authority to represent his interest in effecting a lease.

The statement in the majority opinion that Berthy claimed no right to represent his co-owners in the leasing of the 4700-acre tract is a clear mistake. Both Berthy and Maust testified categorically to that effect and Blair certainly confirmed it in executing the lease to Gauley-Eagle. Berthy took in his own name a lease on 404 acres lying within the boundary of the 4700 acres in controversy. This lease, like the lease on the 4700 acres in controversy, was executed and delivered by Blair, Berthy and their wives, but not by Dickinson. Berthy verbally assigned the lease in question to Gauley-Eagle which employed Excavators, Inc., to strip mine the coal on a tonnage basis. Royalties were paid to Blair, Berthy and Dickinson, the latter by his acceptance being estopped to deny the validity of the lease in writing which had been submitted to him for his approval. These royalties were knowingly paid by

Gauley-Eagle to Berthy, he transmitting their shares to Blair and Dickinson.

The business of Gauley-Eagle apparently was quite successful because at the instance of Berthy, J. R. Maust, its president, began to expand his boundary and his operations. Maust testifies that with this in view the owners had laid out in the explored and acceptable section of the 11,000 acres a 4700-acre tract of which his company was the sole prospective lessee, with Berthy authorized to act for the owners.

In the late fall of 1946 and in the early spring of 1947 Gauley-Eagle began to extend its roadways and works beyond the boundaries of the 404-acre tract. Dickinson and his representatives were on the ground several times with the opportunity to observe this expansion. In the meantime Maust had negotiated with The Baltimore and Ohio Railroad Company, owners and operators of Strouds Creek & Muddlety Railroad Company, for a siding to serve his enlarged works upon the 4700-acre tract. This was done with the knowledge of the three owners so that on May 8, 1947, Blair, Berthy, Dickinson and their wives conveyed a strip of land to the railroad company for the purpose of building a siding and permitting in part construction of a tipple and a siding. This siding was to be constructed for the sole use and benefit of the grantors, their heirs, successors and assigns. Immediately after this conveyance, the railroad commenced the construction of the siding. Gauley-Eagle prepared to move a steel tipple and did move and construct one at considerable expense upon the site in question. It contended that in the construction of roadways, grading, procuring equipment, and moving the steel tipple, Gauley-Eagle expended not less than $125,000.00, partly done with the personal knowledge of John L. Dickinson and all of it with his constructive knowledge, if, as Berthy testified, he was in fact authorized to represent Dickinson. That, viewing the testimony, as this Court should, favorably to the finding of fact by the trial tribunal, is the situation in the rough. The negotia-

tions for a lease in writing began at the insistence of Gauley-Eagle in the late fall of 1946 and ended in June of 1947.

On June 6, 1947, in a meeting at the office of John L. Dickinson on the mezzanine floor of the Kanawha Valley Building, after having selected one of two leases prepared by different counsel and having agreed to alter that draft as to the payment of minimum royalty and four other matters that were minor, Dickinson stated:"We have an agreement here." Berthy, Blair and Maust agreed. Maust, the President of Gauley-Eagle, who left this conference believing that the terms of a lease had been approved by the three owners and that a writing would be so executed and delivered, returned to the operation and continued expenditures of substantial sums of money by Gauley-Eagle under that lease.

After the meeting of June 6, John L. Dickinson attended no further meetings. This, according to his contention, was not because an agreement upon all of the material terms of a lease had been arrived at, but due to the advice of his physician. His brother, C. C. Dickinson, appeared for him. C. C. Dickinson states that he discussed with his brother the question of whether a complete agreement upon all of the material terms had been reached at the meeting of June 6, and was assured that it had not. He states further that at the meeting he first attended on June 18 he raised that question at the outset, telling Maust that if he, Maust, took the position that an agreement had been reached, the meeting about to be held would be called off. C. C. Dickinson says that Maust reluctantly admitted that no agreement had been reached. All of this Maust expressly denies. With contradictory statements under oath, the one supporting and the other undermining the decree of the trial court, this Court is required to accept as true the supporting statement.

In my opinion the complainants and Gauley-Eagle have clearly established their right to have the 11,000-acre

tract partitioned subject to the lease to Gauley-Eagle of the 4700-acre boundary which was occupied and improved at substantial expense after a verbal lease thereof subsequently to be reduced to writing had been entered into with the owners. John L. Dickinson should be required to execute the lease of June 21, 1947. Any equity Berthy may have in the 404-acre tract may be provided for. I do not believe that he has shown a right to the 398-acre tract beyond his one-third undivided ownership thereof.

In my opinion the development of this proceeding would sustain a finding that T. J. Blair, Jr., J. N. Berthy, Jr., and John L. Dickinson were partners engaged in the business of acquiring and selling or leasing coal lands or, if not, certainly that they were together engaged in a joint adventure for the purpose of carrying out a single transaction, i.e., the leasing of 4700 acres of coal land to Gauley-Eagle Coal & Coke Company. In either case as to third persons all three would be bound by the act of one in the course of and within the scope of the intended business. Here we have two of the three persons concerned executing a coal lease to Gauley-Eagle.

It is clear and without contradiction that the original purpose of their ownership of the 11,000-acre tract was to own and lease coal lands, real estate and personal property. That was the object of forming the West Virginia corporation known as Muddlety Coal Land Company. That purpose was never abandoned by the three owners, although at the behest of John L. Dickinson, the ownership of the land was transferred to the three individuals by the corporation not for the purpose of their ceasing to engage in the same business but to carry it on as individuals in lieu of in the name of a corporate entity. In fact the business of the corporation was continued without deviation. J. N. Berthy, Jr., continued to be their field representative and John L. Dickinson continued to handle the routine office affairs. Rentals seemed to have been paid to each individual and each individual contributed to the payment of taxes and other running expenses. Admittedly Dickin-

son acting alone failed in more than one undertaking to lease all or a part of the property. They did have small parcels leased to operators and also surface tracts to farmers. This all occurred before the illness of John L. Dickinson in August, 1945.

With the foregoing as its background the lease of the 4700 acres was by no means the first but easily the most important transaction that the three owners, either acting by and through a corporation or as individuals, engaged in together. Viewing that transaction alone and their other transactions as mere casual incidents, it may be said that they were acting as joint adventurers, if not, certainly as copartners. 30 Am. Jur. 684.

For the foregoing reasons I would affirm the decree of the Circuit Court of Nicholas County.

Fox, JUDGE, Replying for the Majority:

The dissenting opinion filed herein by Judge Kenna affords us an opportunity to explain the intended meaning of certain language of the majority opinion appearing in the last two paragraphs of that opinion, the effect of which was to require a partition of the 11,000 acres of land involved, free of the alleged lease on 4,700 acres thereof, which we held had never been executed or agreed to by John L. Dickinson. Our position was, and is, that if Dickinson did not make or agree to execute a lease on his one-third interest in the 11,000 acres, then certainly a partition thereof should be made without regard to the lease agreed to by Blair and Berthy as to their interests. Dickinson, as we held, not having agreed to or executed a lease on his share of the 11,000 acres, was not in any way affected by the lease on the 4,700 acres thereof which Blair and Brethy executed, and was entitled to have his share therein assigned to him as though Blair and Berthy had not entered into the lease they executed. This procedure, it seemed to us, necessarily followed our holding that Dickinson did not make, or agree to execute, a lease on his interest in the 4,700 acres involved.

It seems, however, that Judge Kenna, and, (as appears from petitions for rehearing filed herein) counsel for the appellees, construe the language employed as an attempt to nullify and make ineffective the lease on the 4,700 acres, aforesaid, executed by Blair and Berthy to Gauley-Eagle, dated June 21, 1946. How, in the circumstances of this case, they find themselves able to reach this conclusion, is beyond our comprehension.

The most important issue involved in this case was whether John L. Dickinson should be held to have agreed to execute to Gauley-Eagle a coal lease covering his one-third interest in the 4,700 acres, on which Blair and Berthy have executed such lease covering their interests. No question was ever raised as to the right of Blair and Berthy to make the lease they executed, either in the pleadings, or in the evidence on which the case was heard, or in the argument of counsel; and therefore, no issue was presented to this Court as to the effect or validity of the Blair-Berthy lease, or the respective rights thereunder of the parties thereto. Despite the implications arising from the position of counsel to the contrary, we know that it is not only improper, but, in most instances, beyond the power of this Court to pass on questions not submitted to it for decision, and it has not done so in the case at bar. The language employed was not intended to, and, given a reasonable construction in the circumstances of the case, did not affect in any way, as between Blair and Berthy on the one hand, and Gauley-Eagle on the other, their respective rights under the lease between them. This Court did not assume to pass on this question, because it was in no way involved in the case, and was not, and could not, have been presented for decision either in the trial court or in this Court. That question, if it is ever raised, will have to be determined in a future suit or proceeding, unaffected by the decision we have made in the case at bar.

This memorandum is written to make clear the intended meaning of the language of the majority opinion referred

to above; and further to make defense to the implications involved in the contentions that, without excuse or attempted justification, we assumed to decide issues not presented in the case, and attempted to destroy what may be valuable property rights without giving interested parties their day in court. We are unwilling to permit such an interpretation of the opinion filed by us to go unchallenged.